**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| JOHN SHEA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-00793 |
| | ) | Judge Lettow |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**POST-TRIAL BRIEF**

Linda Lipsett (Counsel of Record)
Bernstein & Lipsett, P.C.
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
Telephone: (202) 296-1798
Facsimile:  (202) 496-0555
chouse@bernstein-lipsett.com

Daniel M. Rosenthal
Nari E. Ely
James & Hoffman, P.C.
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
Telephone: (202) 296-1798
Facsimile:  (202) 496-0555
dmrosenthal@jamhoff.com
neely@jamhoff.com

*Attorneys for Plaintiff*

February 8, 2019

# TABLE OF CONTENTS

Table of Authorities...........................................................................................................iii

I.      Facts...............................................................................................................3

        A.  Shea's background ...............................................................................3

        B.  Shea's work as an Investigations Specialist .........................................3

        C.  Shea's work as team lead......................................................................5

        D.  History of complaints and violations regarding overtime for the
            Special Surveillance Team ...................................................................7

        E.  NCIS's justifications for treating the position as exempt.....................9

        F.  Shea's overtime work and pay ............................................................10

II.     Argument......................................................................................................11

        A.  Shea is not an exempt administrative worker. ....................................11

            1.  Standard for the administrative exemption ..............................11

            2.  Shea's surveillance work is non-exempt because it directly
                relates to NCIS's "production function"—criminal and
                counterintelligence investigation—not NCIS's "management or
                general business operations." ...................................................12

            3.  Shea's work as team lead does not constitute "management or
                general business operations." ...................................................15

            4.  NCIS cannot satisfy the other exemption factors.....................20

        B.  As back wages, Shea is entitled to the overtime pay he would
            have received under the FLSA, minus the pay he actually received
            under AUO............................................................................................22

        C.  Shea is entitled to liquidated damages because NCIS has not
            established that it had a reasonable or good faith basis for treating
            Shea as exempt. ..................................................................................23

1.  NCIS provided no evidence that it took active steps to ensure compliance with the FLSA prior to this lawsuit or had a reasonable basis for its exemption decision prior to this lawsuit. ................................... 24

2.  NCIS cannot rely on the passage of time or the lack of complaints from Shea. ................................................................................................ 25

3.  NCIS's current explanation of its conduct cannot satisfy its burden. .......... 26

4.  NCIS has admitted to multiple errors and violations regarding the overtime pay of the Special Surveillance team. ............................ 28

5.  NCIS's reclassification of the Investigations Specialist position supports a ruling for Shea on the liquidated damages issue. ......................... 29

D.  Given the evidence presented at trial, the Court should reconsider its grant of summary judgment to the Government as to willfulness. ............... 30

1.  The trial record shows that NCIS violated the FLSA in a willful manner. ..................................................................................................... 31

2.  The trial record contradicts the factual basis for the Court's prior decision on willfulness. .................................................................. 33

E.  Shea is entitled to attorneys' fees and costs. ................................................ 34

Conclusion .................................................................................................................. 34

Appendix A ................................................................................................................ 36

Appendix B ................................................................................................................ 39

Appendix C ................................................................................................................. 41

Certificate of Service ................................................................................................. 63

## TABLE OF AUTHORITIES

**Cases**

*Abadeer v. Tyson Foods, Inc.*, 975 F. Supp. 2d 890 (M.D. Tenn. 2013)...........................................32

*Adam v. United States*, 26 Cl. Ct. 782 (1992) ......................................................................... 14, 21

*Adams v. United States*, 36 Fed. Cl. 91 (1996)...........................................................................14

*Adams v. United States*, 78 Fed. Cl. 536 (2007) ...............................................................12, 15, 16

*Angelo v. United States*, 57 Fed. Cl. 100 (2003)..........................................................................14

*Astor v. United States*, 79 Fed. Cl. 303 (2007).............................................................................14

*Benavides v. City of Austin*, No. A-11-CV-438-LY, 2013 WL 3197636
    (W.D. Tex. June 20, 2013) ............................................................................................ 18, 19

*Berg v. Newman*, 982 F.2d 500 (Fed. Cir. 1992) ....................................................................11-12

*Billings v. United States*, 322 F.3d 1328 (Fed. Cir. 2003) ...........................................................14

*Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir. 2002)....................................................13

*Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246 (2011) ...............................................28

*Bull v. United States*, 68 Fed. Cl. 212 (2005) ..............................................................................31

*Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908 (9th Cir. 2003)............................................ 28, 31

*Chao v. Barbeque Ventures, LLC*, 547 F.3d 938 (8th Cir. 2008) ......................................... 23-24, 25

*Cook v. Carestar, Inc.*, No. 2:11-CV-00691, 2013 WL 5477148
    (S.D. Ohio Sept. 16, 2013) ................................................................................................32

*Florida Power & Light Co. v. United States*, 66 Fed. Cl. 93 (2005) ..........................................30

*Grandits v. United States*, 66 Fed. Cl. 519 (2005) ..................................................................12-13

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999)......................................23, 24, 26, 27

*Lanehart v. Horner*, 818 F.2d 1574 (Fed. Cir. 1987) ..................................................................14

*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3rd Cir. 1991) ......................................25

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) ..........................................................31

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233 (11th Cir. 2008) ...................... 26, 31

*Morrison v. Cty. of Fairfax, VA*, 826 F.3d 758 (4th Cir. 2016) ...................................... 17, 18

*Mullins v. City of N.Y.*, 653 F.3d 104 (2d Cir. 2011) ......................................... 17, 18, 19

*Precision Pine & Timber, Inc. v. United States*, 81 Fed. Cl. 235 (2007) ...........................30

*Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58 (2d Cir. 1997) .........................25

*Reich v. State of N.Y.*, 3 F.3d 581 (2d Cir. 1993) .................................................... 13, 17

*Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447 (S.D.N.Y. 2008) ...................24

*Wolfchild v. United States*, 72 Fed. Cl. 511 (2006) .......................................................30

## Statutes and Regulations

29 U.S.C. § 216(b) ...............................................................................................................34
29 U.S.C. § 260 ........................................................................................................... 23, 27

5 C.F.R. § 550.1101 ..............................................................................................................29
5 C.F.R. § 551.104 ........................................................................................................ 16, 31
5 C.F.R. § 551.202 ................................................................................................................29
5 C.F.R. § 551.202(c) ...........................................................................................................12
5 C.F.R. § 551.202(e) .................................................................................................... 27, 32
5 C.F.R. § 551.206 ..................................................................................................... 13, 21, 32
5 C.F.R. § 551.206(a) .................................................................................................12, 15, 27
5 C.F.R. § 551.206(e) ...........................................................................................................21
29 C.F.R. § 541.3 ......................................................................................................... 14, 18
29 C.F.R. § 541.3(b)(1) .........................................................................................................15
29 C.F.R. § 541.3(b)(2) ................................................................................................. 18, 19
29 C.F.R. § 541.201(a)-(b) ...................................................................................................13
29 C.F.R. § 541.700(b) .........................................................................................................16

## Rules

RCFC 30(b)(6) .......................................................................................................................10

Based on the evidence presented at trial, the Court should rule that John Shea is not an exempt administrative worker under the Fair Labor Standards Act (FLSA). The Court should award Shea back wages and liquidated damages.

Shea performs surveillance. He collects information by discretely following individuals and observing their behavior, as part of criminal and counterintelligence investigations at the Naval Criminal Investigative Service (NCIS). Shea's function—collecting information for investigations—is not part of the management or general business operations of NCIS. It is instead part of NCIS's basic mission. For these reasons, the Court has already indicated at the summary judgment stage that Shea's work as a "line Investigations Specialist" is not exempt. *See* ECF No. 18 ("SJ Order") at 18. The trial record confirms that conclusion.

The Government relies heavily on Shea's work as "team lead." But the trial record shows that team leads spend nearly all their time as team members, doing the same surveillance work described above. Moreover, the most reliable evidence demonstrates that Shea has served as team lead on only approximately one quarter of missions, occupying only approximately one quarter of the team's time in the field.

In any event, precedent establishes that even full-time "team leads" are exempt only when they perform supervisory tasks like discipline and performance evaluations, or when the team itself performs exempt work. The trial record establishes that neither condition is satisfied here.

NCIS should have known better than to classify Shea and his team members as exempt administrative workers. Shea and his supervisor raised questions and complaints about overtime pay for years before Shea filed this lawsuit. But the record contains no

evidence that NCIS took steps to check whether it was complying with the FLSA until after this lawsuit was filed. NCIS does not know how or why Shea's position was originally classified as exempt, and NCIS cannot explain why there is no documentation explaining that classification. Despite claiming to have systems for monitoring FLSA compliance, NCIS admits that no such monitoring occurred here prior to the filing of this lawsuit. Notably, prior to the filing of this lawsuit, NCIS classified a GS-7 Investigations Specialist as exempt and then, even after changing his classification to non-exempt as a GS-9, failed to pay him in accordance with the FLSA—actions that were unlawful by the admission of NCIS's own head of classification, but which were never caught by NCIS. Belatedly, the agency has now acknowledged its errors by changing the classification of the entire team to non-exempt. And NCIS's head of classification admitted that she was wrong about one of the central premises underlying her earlier testimony in defense of Shea's classification.

In sum, the Court should reject the Government's claim that Shea is an exempt administrative worker. The Court should award Shea back wages equal to the difference between what he would have earned if NCIS had correctly classified him as non-exempt (*i.e.*, time-and-a-half for his overtime hours) and what NCIS actually paid him under a system known as Administratively Uncontrollable Overtime (AUO). The Court should then award liquidated damages based on NCIS's failure to show reasonable grounds and good faith with respect to its classification of Shea as exempt. And in light of the evidence presented at trial, the Court should reconsider its ruling granting summary judgment to the Government on the question of whether its conduct was willful. Finally, the Court should award reasonable attorneys' fees and costs to Shea, in an amount to be determined after submission of a fee petition.

## I.   Facts

### A.  Shea's background

Shea graduated from high school in the early 1980s and then, after a stint as a courier, attended the Prince George's County Police Academy. Tr. at 40:1-25 (Shea). For the next twenty-two years, Shea worked for the Prince George's County police department, starting in general patrol and eventually becoming a narcotics detective. Tr. at 41:7-21 (Shea). Shea has no education beyond high school. Tr. at 40:14-16 (Shea).

In 2010, after leaving the police department, Shea became an Investigations Specialist at NCIS. Tr. at 41:22-42:6 (Shea). Shea's duties in that position are described below. Shea's former supervisor, Dennis Freeman, testified that Shea is a "man of character" and an "honest person" who "works very hard." Tr. at 301:6-13, 351:12-16, 352:5-7.

### B.  Shea's work as an Investigations Specialist

As an Investigations Specialist, Shea serves as a member of NCIS's Special Surveillance Team. Tr. at 45:10-14 (Shea). Shea summarized his work as "assist[ing] in . . . criminal and counterintelligence investigations" by "conduct[ing] surveillance." Tr. at 42:11-20. According to Nanette Sevigny, another Investigations Specialist who has served as acting supervisor of the team, the "main duty of the position" is "conducting surveillance based on the case agent's needs." Tr. at 460:5-10.

Accordingly, the Special Surveillance Team spends much of its time in the field conducting surveillance. Tr. at 170:8-171:14 (Shea); 332:4-16 (Freeman); 436:2-4 (Sevigny). The team's surveillance work is organized into surveillance "missions," which

often last a week or more, and which frequently require travel to the location of the surveillance target. Tr. at 48:6-23 (Shea).

The purpose of surveillance missions at NCIS is to gather information for use in investigations. Tr. at 345:10-15 (Freeman). NCIS agents may call on the Special Surveillance Team, for example, to observe and document a meeting between the subject of their investigation and a foreign intelligence agent. Tr. at 48:24-49:13 (Shea).

While on a surveillance mission, the team follows the subject while avoiding detection. Tr. at 63:10-64:22 (Shea). The team uses surveillance tactics learned at the beginning of each employee's tenure as an Investigations Specialist. Tr. at 73:6-12 (Shea); 441:12-20 (Ester). The team is trained, for instance, to take turns serving as "the eye," the team member with a direct visual on the subject. Tr. at 68:10-72:22 (Shea). Depending on the case agent's objectives, the team may stake out a subject's residence for extended periods of time, Tr. at 72:13-22 (Shea), or take discrete photographs of the target in a restaurant, Tr. at 54:25-55:13 (Shea).

Shea testified using demonstrative exhibits illustrating the equipment he uses on surveillance—such as a monocular, radio, and cameras—and the surveillance tactics employed by the team. *See* PDX1 and PDX2; Tr. at 52:2-55:15; 68:2-72:22.

On each mission, a member of the team takes turn-by-turn notes of the subject's movements and activities and drafts a post-operation summary of the mission called an investigative action. Tr. at 495:23-496:15 (Sevigny). Those notes and the investigative action become part of the case agent's investigative file. Tr. at 496:24-497:7 (Sevigny).

### C.  Shea's work as team lead

On each surveillance mission, one team member is designated as "team lead." The record contains differing estimates of how often Shea served in the "team lead" role. The best evidence on the point is a list created by Dennis Freeman showing who was team lead on each mission during his tenure as supervisor. Ex. P25. Freeman's list can be further refined through testimony from Freeman, Shea, and Sevigny. Putting this evidence together, Shea has served as team lead on less than one quarter of missions, occupying less than one quarter of the team's work in the field.[1]

Specifically, Freeman's original list showed that Shea was team lead on 18 out of 60 missions, or 30%. These 30% of missions occupied 33% of the team's days in the field, according to the dates included in Freeman's list.

However, on cross-examination, Freeman acknowledged that, as to three missions, he had wrongly attributed the team lead role to Shea. Tr. at 341:6-345:2. This testimony was confirmed by testimony from Shea and Sevigny. Shea and Sevigny further identified three other missions on which Freeman had incorrectly recalled that Shea served as team lead, and a fourth in which Shea departed partway through the mission. Tr. at 501:6-502:15 (Shea); 464:24-466:6 (Sevigny).

Putting this testimony together, Shea was team lead on only 11 full missions and one partial mission during Freeman's tenure. *See* App. A. These missions constituted

---

[1]     As Appendix A to this brief, Shea has provided a table indicating the number and duration of missions on which he served as team lead, according to Freeman's chart of missions and the testimony of Freeman, Shea, and Sevigny. As Appendix B, Shea has provided a chart aggregating the data in Appendix A and calculating the overall percentage of missions and days in which Shea served as team lead. The figures in this section are taken from the two appendices.

approximately 19% of the team's missions during Freeman's tenure and occupied

approximately 22% of the team's days in the field. App. B.

Freeman also testified that, based on information he reviewed, Shea was likely team

lead on 4 or 5 missions out of 22 missions that occurred during fiscal year 2014, which was

before Freeman's tenure as supervisor, but which overlaps with the relevant period in this

case. This constitutes 18% to 23% of the missions during that time period.

The record further shows that, even when Shea was designated as team lead, he

spent 90%-95% of his time doing the same surveillance work as the rest of the team

members. Tr. at 83:4-16 (Shea). Shea's testimony on this point was confirmed by Sevigny.

Tr. at 461:19-462:3. And it was not contradicted by any witness. Freeman, for example, did

not provide an estimate of how much of a team lead's time during a mission is spent

performing lead-specific duties. Tr. at 310:14-314:23; 317:7-318:5. Although Freeman

agreed with NCIS's counsel that "100 percent of the time, [a team lead] is responsible for

the mission," that testimony did not address how much time is actually spent on team lead

duties. Tr. at 311:4-6.

In short, the record shows that Shea has served as team lead on at most 25% of

missions and has spent at most 10% of his time during those missions performing team

lead duties. Putting those figures together, Shea has spent no more than 2.5% of his time on

team lead duties.

As to the nature of the work done by the team lead, Shea and Freeman provided

differing descriptions. There is no dispute, however, about what team leads do **not** do:

discipline team members, participate in performance evaluations, maintain personnel

records, participate in personnel decisions such as hiring or promotions, or otherwise

serve as a supervisor (a role filled, instead, by Freeman and now Scott Cooper). Tr. at 85:1-86:1, 110:1-5 (Shea); 462:4-18, 477:20-478:1 (Sevigny); 296:5-7 (Freeman). Further, the record contains no evidence that Shea has ever provided input into NCIS policies or procedures, either when serving as team lead or team member. Tr. at 76:10-15 (Shea)

As to the duties that the team lead does perform, these duties consist largely of serving as a point of contact between the case agent and supervisor, on one hand, and the surveillance team, on the other. Tr. at 83:4-16 (Shea); 460:22-461:18 (Sevigny). Before the mission, the team lead meets with the case agent and transfers information from the surveillance request worksheet filled out by the case agent onto a standardized form called the ops plan. Tr. 79:5-81:1 (Shea); 460:24-461:5 (Sevigny). Once in the field, the team lead informs the rest of the team of any new information from the case agent or supervisor, and contacts the case agent or supervisor to update them on the mission's progress and, when necessary, request guidance when significant decisions arise. Tr. at 81:23-84:25, 194:15-22 (Shea); 461:9-18 (Sevigny).

NCIS will likely provide a different characterization of the team lead role based in part on Freeman's testimony. We address this evidence at pages ___ below.

D. **History of complaints and violations regarding overtime for the Special Surveillance Team**

During Freeman's tenure as Shea's supervisor, overtime pay for the Special Surveillance Team "had been an ongoing issue for several years." Tr. at 353:11-14 (Freeman). In 2012, Shea approached his supervisor with concerns about his overtime pay. Tr. at 100:10-101:8 (Shea). Specifically, Shea complained that, because he only received pay under the AUO system, he did not receive any additional overtime pay for hours

exceeding the threshold for a 25% AUO premium. *Id.* Shea asked his supervisor why another group of employees received additional overtime pay along with their AUO premium. *Id.*

Shea continued to raise the issue for the next several years with supervisors and staff members. Tr. at 101:9-102:9 (Shea). In 2015, he relayed his concerns to Freeman, who was new to the supervisor position. Tr. at 352:21-354:4 (Freeman). Freeman relayed Shea's concerns to an administrative staff member, Teresa Hemmer, as well as to Brian Brown, who was Freeman's supervisor and who reported directly to the agent who ran the Office of Special Projects. Tr. at 353:5-17 (Freeman); Ex. P1. Freeman himself also believed that team members should receive additional overtime pay, and he relayed that opinion to Hemmer and Brown. Tr. at 353:18-354:6 (Freeman).

NCIS did not take any action, however, to provide more overtime pay to team members. Tr. at 354:7-10. From 2012, when Shea first complained, to 2016, when Shea filed this lawsuit, NCIS continued to classify Shea as non-exempt and to deny him any additional overtime pay beyond his AUO premium. Tr. at 91:20-24 (Shea). And as described below, during that time period, NCIS did not re-assess Shea's status as non-exempt.

NCIS finally announced a chance to Shea's classification on December 14, 2018—the last business day before the trial. ECF No. 43. That decision is discussed below.

Meanwhile, NCIS applied the exempt classification to other members of the Special Surveillance Team. When George Ester started on the team as a GS-7 Investigations Specialist, he was classified as exempt. Tr. at 411:21-25 (Ester). NCIS's head of classification, Stacey Cruz, admitted that it would be a violation of the FLSA for NCIS to treat a GS-7 Investigations Specialist as exempt. Tr. at 279:8-11. When Ester became non-

exempt as a GS-9, NCIS failed to pay Ester overtime under the FLSA; instead, he only received his AUO premium. Tr. at 413:18-415:9 (Ester). Cruz testified that it would be a violation of the FLSA to deny FLSA overtime pay to a non-exempt employee. Tr. at 263:10-16; 273:8-11.

### E.  NCIS's justifications for treating the position as exempt

NCIS—through its corporate designee and head of classification Stacey Cruz—admits that it has no knowledge of which exemption was applied when the Investigations Specialist position was originally classified as exempt in 2007. Tr. at 253:10-20. NCIS likewise admits that it has no knowledge of the reasoning underlying that classification decision, who classified the position, whether the classifier had received any training on the FLSA, or the nature of the process used to classify the position as exempt. Tr. at 253:24-254:14. Further, Cruz testified that she did not even look for records regarding the classification of the position in 2007. Tr. at 254:16-255:1.

NCIS also admitted that the classification of the position was not reviewed or re-assessed at any time prior to the filing of this lawsuit, in spite of the questions and complaints noted above. Tr. at 255:21-256:2 (Cruz).

The trial record also contains little explanation of why NCIS continued to treat the position as exempt after the filing of this lawsuit. On this point, NCIS offered terse testimony from Cruz, occupying less than two pages of the trial transcript. Tr. at 393:23-395:19. This testimony consists mainly of quotes from Shea's position description, with little explanation of how these quotes support the classification decision. *Id.* For example, Cruz did not cite any statute, regulation, or precedent as part of her explanation. *Id.*

Meanwhile, Cruz admitted that she made no efforts to determine whether Shea actually performed the duties from the position description on which she relied. Tr. at 403:3-406:5. Cruz also admitted that she made no effort to determine how much time was spent on various duties—information missing from the position description. Tr. at 260:11-261:4; 403:11-404:4; 404:12-405:1.

Cruz's further admitted that, in her initial assessment of Shea's exemption status, performed prior to her deposition testimony under RCFC 30(b)(6), she relied in part Shea's performance of production work tied to criminal investigations as a factor supporting Shea's exempt classification. Tr. at 241:10-21. At trial, Cruz initially reaffirmed this prior testimony. Tr. at 275:24-276:5; 374:25-375:7. But when pressed, Cruz admitted that she had been incorrect in concluding that this factor supported exemption. Tr. at 375:21-376:9.

Cruz testified that NCIS senior management had decided to reclassify all Investigations Specialists as nonexempt. Tr. at 279:15-282:15; 386:24-387:11. Cruz, who typically oversees classification decisions, did not oversee this reclassification, was not briefed on the reclassification process, and NCIS did not ask for her opinion about the change. Tr. at 282:5-15; 387:2-18. Yet, Cruz also stated that if an employee was classified as nonexempt, that classification would reflect that the classification division had determined that the employee should be nonexempt under the regulations. Tr. at 385:23-386:2.

**F. Shea's overtime work and pay**

From July 2014 to September 2018, Shea worked 2,572.93 overtime hours. Ex. P4. The record shows that, if Shea had been paid time-and-a-half for that work, he would have received $172,130.43 in overtime pay. *Id.*

10

Instead, Shea received $98,991.02 under the AUO system. P4. Under AUO, Shea received a premium in addition to his regular salary, based on how many overtime hours he worked in the prior quarter. The AUO premium is capped at 25% of an employee's salary, and an employee can achieve a 25% premium for a quarter if the employee worked approximately 110 overtime hours in the prior quarter. Tr. at 92:2-20 (Shea). Under AUO, the employee does not receive any additional pay for working more than 110 overtime hours in a quarter. Tr. at 91:25-93:6 (Shea).

If a non-exempt employee is placed on AUO, then the employee typically receives the applicable AUO premium plus an additional amount of overtime under the FLSA, known as a "bump up." Tr. at 263:17-264:6 (Cruz). The parties agree that if Shea had been classified as non-exempt and had remained on AUO, he would have received "bump up" payments totaling $42,750.84 during the relevant time period. *See* P4.

As a matter of policy, however, NCIS does not generally permit non-exempt employees to remain on AUO. Tr. at 264:9-12 (Cruz). Thus, NCIS does not pay the "bump up." Instead, for a non-exempt employee, NCIS simply pays time-and-a-half for his or her overtime work. Tr. at 402:12-18 (Cruz). Indeed, even when Ester was classified as non-exempt and placed on AUO, NCIS did not pay him the "bump up." Tr. at 414:10-415:9 (Ester).

## II.    Argument

### A.  Shea is not an exempt administrative worker.

#### 1.  Standard for the administrative exemption

Employees are presumed to be non-exempt from the FLSA, and the Government has the burden to prove that an employee is exempt. *Berg v. Newman*, 982 F.2d 500, 503 (Fed.

11

Cir. 1992); 5 C.F.R. § 551.202(c). Here, the Government asserts the administrative

exemption. *See* 29 U.S.C. § 213(a)(1). To establish the applicability of the administrative

exemption, the Government must satisfy three factors:

> (1)  The employee's "primary duty is . . . directly related to the management or general business operations, as distinguished from production functions, of the employer."
> (2)  The employee's "primary duty is the performance of office or non-manual work."
> (3)  The employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."

5 C.F.R. § 551.206(a).

> ### 2.  Shea's surveillance work is non-exempt because it directly relates to NCIS's "production function"—criminal and counterintelligence investigation—not NCIS's "management or general business operations."

Under the first factor set forth above, the Government must show that the

employee's work is "directly related to . . . management or general business operations." 5

C.F.R. § 551.206(a). According to the regulations, "management or general business

operations" is distinct from "production functions" of the employer. *Id*. In this section, we

show that Shea's duty of performing surveillance relates to NCIS's "production function"

rather than its "management or business operations." In the following section, we address

Shea's work as "team lead."

Regulations and case law clarify the distinction between production work and

management or general business operations. Production workers are those directly

involved in carrying out the employer's "fundamental function" or "mission." See *Adams v.*

*United States*, 78 Fed. Cl. 536, 542 (2007); *Grandits v. United States*, 66 Fed. Cl. 519, 543

(2005). In a law enforcement agency, for example, employees are non-exempt who

"conduct—or 'produce'—… criminal investigations." *Reich v. State of N.Y.*, 3 F.3d 581, 587

(2d Cir. 1993).

By contrast, "management and general business operations" refers to internal

services not directly related to the agency's fundamental function. This exempt work

"contribute[s] to running the [agency] itself." *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120,

1127 (9th Cir. 2002) (internal quotation marks omitted). Examples of "management and

general business operations" include determining the employer's taxes, negotiating

employee pay or benefits, or doing procurement. See 29 C.F.R. § 541.201(a)-(b).

Importantly, because the employer must satisfy all three exemption factors, an

employee whose primary duty is "production work" is non-exempt even if the employer

can satisfy the other factors, *e.g.*, demonstrate that the employee exercises great discretion

at work. 5 C.F.R. § 551.206.

NCIS's production function is the performance of criminal and counterintelligence

investigations. Tr. at 266:15-23 (Cruz). The Special Surveillance Team is directly involved

in this production function because it collects information for use in investigations at the

request of NCIS case agents who conduct those investigations. Tr. at 297:11-23; 345:10-15

(Freeman). As affirmed by Freeman, investigations are based in large part on the

"collection of information," and the Special Surveillance team "contribut[es] to

investigations" by "collecting information" for investigations. Tr. at 345:6-18.

NCIS's head of classification, Cruz, has admitted that Shea's surveillance duties

constitute production work. Cruz agreed that Shea's surveillance work was production

work at NICS, Tr. at 275:4-23; 372:11-20, and that Shea's work "when he's not serving as

team lead" is "probably . . . production work." Tr. at 373:7-8. This testimony mirrors the conclusion reached by the Court in its summary judgment opinion. *See* SJ Order at 18.

This result is confirmed by DOL regulations. Although OPM administers the FLSA for federal employees, this Court often looks to DOL regulations for guidance in interpreting the FLSA. *See, e.g.*, *Astor v. United States*, 79 Fed. Cl. 303, 310 (2007) (relying on DOL's regulations for "explanation of . . . key terms" and "guidance in interpreting the governing OPM regulations"); *Angelo v. United States*, 57 Fed. Cl. 100, 113-14 (2003) (relying on DOL's regulation defining the executive exemption); *Adams v. United States*, 36 Fed. Cl. 91, 100 (1996) (relying on DOL's regulations regarding standby time); *Adam v. United States*, 26 Cl. Ct. 782, 786 (1992) ("[T]he Labor Department materials provide guidance helpful to our construction of not only the FLSA, but also the OPM regulations.").

Indeed, OPM must administer the FLSA in a manner that ensures consistency with DOL's administration of the FLSA. *See Billings v. United States*, 322 F.3d 1328, 1334 (Fed. Cir. 2003) ("OPM's guidelines must harmonize with the . . . Secretary of Labor's regulations."); *Astor*, 79 Fed. Cl. at 307 ("Congress instructed OPM 'to administer the [FLSA] in a manner consistent with the Department of Labor's administration of [the] FLSA.'" (*quoting Lanehart v. Horner*, 818 F.2d 1574, 1578 (Fed. Cir. 1987)).

Here, a DOL regulation expressly includes "surveillance" on a list of job duties that do not satisfy the administrative, executive, or professional exemptions. 29 C.F.R. § 541.3. Specifically, the regulation states that the exemptions do not apply to:

> investigators,… and similar employees, regardless of rank or pay level, who perform work such as… preventing or detecting crimes; … **performing surveillance**; … preparing investigative reports; or other similar work… because their primary duty is not the performance of work directly related to the management or general business operations of the employer.

14

29 C.F.R. § 541.3(b)(1).

Shea fits this regulation perfectly. As an Investigations Specialist who provides information for investigations, he is a "similar employee[]" to an "investigator." 29 C.F.R. § 541.3(b)(1). Further, he "perform[s] work such as . . . performing surveillance." *Id.*

The Government has attempted to respond to this regulation by arguing that Shea is not a "first responder." But the regulation does not use the term "first responder," let alone limit its scope to "first responders." On the contrary, the regulation encompasses various tasks that do not meet the ordinary meaning of first response, such as "inspections," "fingerprinting suspects," and "preparing investigative reports"—not to mention "performing surveillance" itself. 29 C.F.R. § 541.3(b)(1). The text of the regulation supersedes any informal label that might be applied to it.

The regulation confirms that Shea's surveillance work is not administrative in nature.

### 3. Shea's work as team lead does not constitute "management or general business operations."

As shown above, Shea's surveillance duties are non-administrative. Thus, as the Court suggested at the summary judgment stage, any Government defense of Shea's classification must rest on duties other than his work as a "line Investigations Specialist."

Recognizing this, the Government relies heavily on Shea's work as team lead. But for several reasons, Shea's team lead work does not make him an administrative worker.

To begin, under the text of the regulations, the administrative exemption test must be applied to an employee's "primary duty." 5 C.F.R. § 551.206(a). *See Adams*, 78 Fed. Cl. at 546 ("The first step in determining whether an administrative exemption is justified is

15

identifying the employee's primary duty so that its character and type may be understood."). Thus, Shea's work as team lead is relevant only if it is his "primary duty."

An employee's primary duty is typically the duty that occupies more than fifty percent of the employee's work time. 5 C.F.R. § 551.104; *Adams*, 78 Fed. Cl. at 550; *see also* 29 C.F.R. § 541.700(b). Here, Shea's team lead work does not come anywhere close to meeting this standard. According to the best evidence, Shea has been team lead on a quarter or fewer of the team's missions, occupying a quarter or less of the team's overall time spent in the field. Further, while on those missions, Shea has spent only five to ten percent of his time on team lead duties. *See supra* at ___. Shea's counsel are not aware of any case in which a Court recognized a "primary duty" that occupied so little of an employee's time, and the Government has cited none.

To be sure, under the regulations, the Government may seek to assert a "primary duty" occupying less than fifty percent of the employee's time. But the Government must meet specific criteria to do so. First, the Government must establish that the duty is the "reason for the existence of the position." 5 C.F.R. § 551.104. Here, however, the Government provided no evidence regarding the "reason for the existence of the position." And the record contradicts any conclusion that serving as team lead is the reason for the existence of the Investigations Specialist position: most Investigations Specialists, including other GS-12 Investigations Specialists, do not serve as team lead. Tr. at 86:12-88:3 (Shea).

Next, for the Government to establish a "primary duty" occupying less than half of an employee's time, the duty must constitute a "substantial, regular part" of the employee's work. *Id.* As shown above, however, Shea spends at most 2.5% of his time in the field on

16

team lead duties. *See supra* at ___. This does not make up a "substantial, regular" part of Shea's work.

Finally, to establish a primary duty occupying less than half of the employee's time, the duty must be "clearly exempt work." *Id.* Even if the Court were convinced by the Government's argument that team lead work is exempt, the Court should still should not conclude it is *clearly* exempt, for the reasons that follow.

Put simply, a team lead does not perform exempt "management or general business operations." As a team lead, Shea remains in the field working alongside his teammates, integrally involved at all times in carrying out the team's surveillance work, and thus contributing directly to NCIS's fundamental function. *See supra* at ___. The nature of Shea's work as team lead is more similar to that of a team member performing surveillance than to administrative workers such as auditors or HR specialists.

Precedent confirms this conclusion. In at least three cases, courts have ruled in favor of employees who perform a function similar to "team lead." One of these cases involved police sergeants engaged in "supervision of subordinate police officers," including "apportioning work," "reassigning and relocating officers," and "directing them to surveil certain areas." *Mullins v. City of N.Y.*, 653 F.3d 104, 115, 118 (2d Cir. 2011). Another case involved investigators who "supervis[e] State Troopers' investigations" of crimes. *Reich*, 3 F.3d at 585. A third involved fire captains, including station and shift commanders who supervised fire stations. *Morrison v. Cty. of Fairfax, VA*, 826 F.3d 758, 763 (4th Cir. 2016). In each of these cases, the courts granted judgment to the plaintiffs, notwithstanding their work overseeing other employees.

The Government's exemption defense is weaker than that rejected in *Reich, Mullins,* and *Morrison.* First, unlike the plaintiffs in those cases, Shea does not serve in the "lead" role in a full-time capacity. Second, Shea exercises considerably less managerial and supervisory authority than the plaintiffs in those cases. In *Morrison,* for example, the plaintiff fire captains completed annual evaluations of firefighters on their crews, administered discipline, and updated policies. *See* 826 F.3d at 763-64. Undisputedly, Shea is not involved in annual reviews, discipline, or NCIS policies. Likewise, in *Mullins,* the plaintiffs instructed officers on proper procedures, directed them, and monitored their use of proper equipment and accurate recordkeeping. *See* 653 F.3d at 109. Here, again, Shea exercises less authority.

DOL regulations lead to the same conclusion. As shown above, this Court regularly consults DOL regulations, and OPM must administer the FLSA in a manner consistent with DOL regulations. Here, a DOL regulation expressly states that the administrative exemption does not apply to a surveillance worker who "directs the work of other employees" in performing surveillance. 29 C.F.R. § 541.3(b)(2).

The Government has made several attempts to escape the force of this regulation. First, as discussed above, the Government has wrongly attempted to elevate an informal label for the regulation (the "first responder regulation") over its plain text. *See supra* at ___.

Next, the Government has cited one case in which a court held that 29 C.F.R. § 541.3 did not lead to a judgment for the plaintiffs. *See Benavides v. City of Austin*, No. A-11-CV-438-LY, 2013 WL 3197636 (W.D. Tex. June 20, 2013). Yet, *Benavides* is distinct from this case. While the plaintiffs in *Benavides* had a supervisory role in the field, similar to the Government's conception of Shea's role, they also performed "many managerial and

18

administrative duties" when not acting in that capacity. 2013 WL 3197636, at *8. These duties included "evaluating personnel performance, responding to community complaints, maintaining personnel records, initiating disciplinary action for violations of EMS operational policies and procedures, and making recommendations on promotions and other personnel actions." *Id.*

Here, there is no evidence that Shea performs any similar duties. Shea does not evaluate personnel performance, respond to community complaints, maintain personnel records, initiate disciplinary actions, or make recommendations on personnel actions. Tr. at 85:1-86:1 (Shea); 462:4-18 (Sevigny). And unlike in *Benavides*, Shea's service as team lead hardly extends outside his field work. The factual predicate for the *Benavides* decision is entirely absent here.

Notably, the points above lead to a ruling for Shea even if the Court credits entirely the testimony and evidence presented by the Government. Specifically, the Government describes the team lead as responsible for directing the work of other Investigations Specialists and overseeing the team's operations. But the precedent cited above, as well as the DOL regulation, apply to employees who direct other employees and oversee operations. *See, e.g.*, *Mullins*, 653 F.3d at 115 (finding an employee non-exempt who "supervis[es] . . . investigations" and "direct[s] [subordinates] to surveil certain areas"; 29 C.F.R. § 541.3(b)(2) (holding that certain employees are non-exempt even if they "direct[] the work of other employees").

In short, Shea is non-exempt even under Government's version of the facts. But if the Court chooses to sort through the competing descriptions of the team lead role, it should hold that Shea's testimony provides the most accurate description. First, Shea was a

credible witness who was described by an opposing witness, his former supervisor, as a "man of character" and an "honest person." *See supra* at ___. Second, Shea testified with the greatest detail and specificity regarding the team lead role. *See, e.g.*, Tr. at 79:5-86:11. Third, Shea's testimony was corroborated by that of Sevigny. *See* Tr. at 460:22-461:5 (describing the team lead as mainly responsible for "coordinating the information from the case agent" and "coordinat[ing] with the team"); Tr. at 461:19-23 (noting that 90% of the team's lead role is the same as that of other team members); 462:4-18 (affirming that the team lead does not perform any supervisory duties).

By contrast, NCIS may rely on the team's Standard Operating Procedure (SOP) and the testimony of Freeman. As to the SOP, it provides only brief and general bullet points on the team lead role. Further, it has not been updated in many years and is considered only a "guideline" *See* Tr. at 463:11-21 (Sevigny); 135:6-9, 142:18-25 (Shea). Meanwhile, Freeman has much less experience with the team lead role than Shea and Sevigny. He was in the field for only a "few" missions per year, and did not claim to have served as team lead on any mission. Tr. at 307:2-12; *see also* Tr. at 503:11-14, 503:25-504:3 (Shea). Shea and Sevigny, by contrast, were in the field on most missions and served as team lead more often; moreover, Sevigny, like Freeman, served as supervisor. Tr. at 459:8-15 (Sevigny).

Finally, neither the SOP nor Freeman's testimony speak to the amount of time that a team lead devotes to that role. Thus, there is no disagreement that at least 90% of a team lead's time is spent on the same duties performed by other team members. *See supra* at ___.

### 4. NCIS cannot satisfy the other exemption factors.

The discussion above has focused entirely on the "management or general business operations" requirement because it most easily resolves the case in Shea's favor.

Nevertheless, the Government has not satisfied the factors either. First, the record contains no evidence to show that Shea's work "includes the exercise of discretion and independent judgment with respect to matters of significance." *See* 5 C.F.R. § 551.206. While Shea makes choices in surveilling targets—for example, determining when to break off from a target to avoid detection, Tr. at 475:20-25 (Sevigny)—those choices involve applying "well-established techniques" to the circumstances. 5 C.F.R. § 551.206(e). As the record shows, a majority of the work of an Investigations Specialist such as Shea is performed by applying their training to the situation at hand. Tr. at 442:6-15 ("There's no real difference between . . . what you learn at JCTA and . . . what you come into doing at NCIS.") (Ester); 451:18-22 ("[T]he majority of the things I do now are still the same basic things that I learned at JCTA.") (Ester); 470:10-471:8 (Sevigny).

Even when serving as team lead, Shea's choices are tightly constrained by "the resources that are available, be it money or equipment or time," which Shea has no power to control. Tr. at 312:23-13 (Freeman). And there is no dispute in the record that when something out of the ordinary occurs on a mission, the team lead contacts the case agent or the supervisor for a decision on how to handle it. Tr. at 194:15-22 (Shea).

Finally, Shea's work does not satisfy the "office or non-manual" criterion for the administrative exemption. There is no dispute in the record that Shea has spent most of his work time in the field. Tr. at 170:8-171:14 (Shea); 332:4-16 (Freeman); 436:2-4 (Sevigny). As in *Adam*, Shea's surveillance duties "are not of the type ordinarily associated with a desk-bound employee." 26 Cl. Ct. at 793.

### B. As back wages, Shea is entitled to the overtime pay he would have received under the FLSA, minus the pay he actually received under AUO.

The parties appear to agree that, if NCIS misclassified Shea as exempt, then he is entitled to at least $42,750.84 in back wages. Tr. at 401:9-18 (Cruz). This is equal to the "bump up" that Shea would have received, in addition to his AUO premium, as a non-exempt employee on AUO. Ex. P4; Tr. at 401:9-18 (Cruz). The "bump up" calculation incorporates an employee's AUO premium as part of the employee's hourly rate, then pays the employee only half of his FLSA regular rate (rather than one-and-a-half) for each overtime hour worked by the employee. *See* Ex. P4.

The record demonstrates, however, that if NCIS had properly classified Shea as non-exempt, he would have received more than the sum of his AUO premiums during the relevant time period (approximately $99,000) and the "bump up" amount ($42,500).

Specifically, NCIS admitted that its policy is to prohibit a non-exempt employee to remain on AUO and thus to pay ordinary time-and-a-half to such employees rather than the AUO premium and "bump up." Tr. at 264:7-12 (Cruz). Indeed, NCIS is aware of only one non-exempt employee who remained on AUO, and not even that employee was paid the "bump up." Tr. at 396:11-16 (Cruz); 415:6-12 (Ester).

If Shea had been removed from AUO and paid time-and-one-half, he would have received $172,130.43 in overtime pay during the relevant period. *See* P4. This amount can be offset by the AUO premium that Shea would have lost under this scenario, $98,991.02. Thus, the remaining damages would be $73,139.41.

In its pre-trial brief, the Government asserts that Shea is "precluded" from arguing for this method of calculating damages because he previously argued that the Court should

22

apply the OPM "bump up" method. ECF No. 35, at 15-16. But Shea made this argument before he learned of NCIS's policy that a non-exempt employee is not permitted to remain on AUO, and thus will not receive the "bump up." It is this policy that forms the basis of Shea's argument set forth above.

Moreover, the Government's argument rings hollow because the Government itself switched positions. In its summary judgment briefs, the Government addressed the damages calculations, but did not advocate for use of the "bump up" method. *See* ECF No. 11, at 18; ECF No. 13, at 14. In response to Shea's invocation of that method, the Government suggested that the Court not apply it because it is "specifically applicable to law enforcement employees" and "Shea is not a law enforcement officer." ECF No. 13, at 14.

Regardless of which method the Court adopts, Shea is also entitled to damages for any additional overtime he worked after September 2018, the last month for which NCIS provided pay and hours data to Shea before the trial. *See* P4. If the Court rules for Shea, it should order supplemental briefing on that topic.

## C. Shea is entitled to liquidated damages because NCIS has not established that it had a reasonable or good faith basis for treating Shea as exempt.

A successful plaintiff under the FLSA is entitled to liquidated damages equal to 100% of back wages, unless the employer demonstrates a reasonable and good faith basis for its actions. 29 U.S.C. § 260. "[T]he burden to show reasonable basis and good faith rests with the government." SJ Order, at 22.

The employer's burden is a "difficult one." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *accord Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir.

2008). Consequently, "double damages [are] the norm and single damages the exception." *Id.*

To avoid liquidated damages, an employer must show, at a minimum, that it took "active steps to ascertain the dictates of the FLSA and then act to comply with them." *Herman*, 172 F.3d at 142. The employer must also "demonstrate objectively reasonable grounds for believing that [it] was in compliance with the FLSA." *Id.*

### 1. NCIS provided no evidence that it took active steps to ensure compliance with the FLSA prior to this lawsuit or had a reasonable basis for its exemption decision prior to this lawsuit.

NCIS cannot meet its burden. There is no evidence in the record that, before this case was filed, NCIS took any "active steps" to comply with the FLSA. *Herman*, 172 F.3d at 142. For example, NCIS presented no evidence that it applied the governing regulations to the Investigations Specialist position before the case was filed. Tr. at 254:2-5 (Cruz). NCIS also presented no evidence that any person trained in the FLSA reviewed the classification of the position before this case was filed. Tr. at 254:9-12 (Cruz). In sum, NCIS presented no evidence that it ever checked whether the position was properly classified, in any manner, before this lawsuit was filed. Tr. at 255:9-256:9 (Cruz).

This should end the inquiry. Where the employer "fails to make any credible evidentiary showing that it, for example, took active steps to ascertain the dictates of the FLSA and then to act to comply with them," the plaintiff is entitled to liquidated damages. *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 465 (S.D.N.Y. 2008).

NCIS also cannot satisfy the second part of the applicable test, focused on whether the employer had a reasonable basis for its actions. *Herman*, 172 F.3d at 142. Here, NCIS offered no evidence regarding the basis for the classification decision that was in place

prior to the filing of this lawsuit. That decision was apparently made in 2007, and not reviewed or reassessed before the filing of this lawsuit. 253:10-255:1 (Cruz). But NCIS does not know who made it or why, and NCIS offered no records regarding the classification. Tr. at 253:24-254:14, 369:5-370:10 (Cruz). Thus, for example, NCIS presented no evidence of whether it relied on the administrative exemption. Tr. at 253:10-19 (Cruz). It is therefore entirely possible that NCIS relied on some other exemption, such as executive or professional exemption—or that NCIS never identified any applicable exemption at all. And if NCIS did rely on the administrative exemption, there is no evidence of why NCIS believed that the exemption applied to Shea. Tr. at 253:20-23 (Cruz).

In short, because NCIS has not established its basis for treating the position as exempt before the lawsuit, the Court cannot assess the reasonableness of that basis, and the Government cannot meet its burden.

### 2. NCIS cannot rely on the passage of time or the lack of complaints from Shea.

NCIS may argue that it satisfied its burden by showing that it had classified the position as exempt for several years without receiving complaints from Shea. But several appellate courts have expressly rejected similar arguments: "The fact that an employer has broken the law for a long time without complaints from employees does not demonstrate the requisite good faith required by the statute." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3rd Cir. 1991) (internal citations omitted); *accord Chao*, 547 F.3d at 942 (same); *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) ("Nor is good faith demonstrated by the absence of complaints on the part of employees.").

Likewise, even under the more employer-friendly "willfulness" test, an appellate court has rejected an employer's argument that it relied on a longstanding prior policy, where the employer "had no idea who made that policy." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1253, 1280 (11th Cir. 2008) (affirming a finding of employer willfulness where employer followed a policy that had been in place for at least 29 years). *A fortiori,* NCIS cannot argue that it relied on the pre-litigation classification, without knowing how it was made or by whom, to avoid liquidated damages.

The results in *Martin, Chao, Reich,* and *Morgan* make good sense because an employer must take affirmative steps to ensure its compliance with the FLSA, *Herman*, 172 F.3d at 142, rather than passively waiting to see if anyone objects to its conduct.

In any event, Shea repeatedly raised questions and complaints about his overtime pay. Tr. at 100:10-102:20 (Shea); Ex. P2. Those complaints began in 2012 and continued to 2015, when Shea complained to Freeman, and Freeman relayed those concerns to his supervisor and an administrative officer. Tr. at 352:24- 353:17 (Freeman). And Freeman further relayed his own opinion that the team should be getting more overtime pay. Tr. at 353:18-354:6 (Freeman). To be sure, these complaints did not specifically invoke the FLSA because Shea was unaware of the difference between exempt and non-exempt employees. Tr. at 103:4-9 (Shea). But they nevertheless sufficed to put the employer on notice of issues related to overtime, which should have led to further investigation.

### 3.  NCIS's current explanation of its conduct cannot satisfy its burden.

NCIS may also contend that it satisfied its burden by demonstrating that it *currently* has a reasonable and good faith belief that it was complying with the FLSA. But even if true—and the record shows otherwise—this would not sustain NCIS's burden.

26

As noted above, the employer must show that it took affirmative steps to comply with the FLSA at the time of the violation. *Herman*, 172 F.3d at 142. The employer's current beliefs or processes do not establish that it took such steps during the relevant time period. This conclusion is confirmed by the statutory language, which describes the relevant showing in the past tense: the employer must show that its conduct "*was* in good faith and that [it] *had* reasonable grounds" for its action. 29 U.S.C. § 260 (emphasis added). Thus, evidence of the employer's current mindset or actions will not suffice.

Further, NCIS's witnesses failed to offer even a current explanation of its classification decision that meets the "reasonable grounds" requirement. NCIS's sole witness on the topic, Cruz, barely articulated any explanation at all for its decision. Cruz's terse explanation largely consisted of brief quotes from the position description, devoid of analysis or citation. *See supra* at ___. Cruz further made several admissions that bar any conclusion that NCIS had reasonable grounds for its actions:

- She did not look for records of the original classification decision. Tr. at 254:24-255:1 (Cruz).

- She asserted that an employee's performance of production work supported a decision to classify them as exempt under the FLSA, Tr. at 275:24-276:5 (Cruz), in spite of the plain text of the applicable regulations. 5 C.F.R. § 551.206(a). Cruz later admitted that she had been incorrect. Tr. at 376:4-9 (Cruz).

- She based her review of Shea's FLSA classification solely on the position description, although the position description lacks information about the time spent on various duties, and in spite of OPM regulations barring such sole reliance. Tr. at 272:1-16 (Cruz); 5 C.F.R. § 551.202(e); JX1. Likewise, she failed to ask anyone about Shea's actual duties. Tr. at 404:5-406:5 (Cruz).

- She stated that NCIS's process for detecting failure to pay FLSA overtime to non-exempt employees had never caught such an

27

error, Tr. at 364:24-365:10, although NCIS has committed at least one such error. Tr. at 414:10-415:9 (Ester).

- She admitted that she does not read OPM decisions regarding the exemption status of employees at her own agency, and thus did not read opinions addressing the exemption status of criminal investigators at NCIS. Tr. 270:18-271:12. Cruz's testimony was inconsistent with the position NCIS took in those OPM proceedings.[2]

### 4. NCIS has admitted to multiple errors and violations regarding the overtime pay of the Special Surveillance team.

NCIS's history of overtime violations further confirms its lack of good faith and reasonable grounds for its actions. *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918-19 (9th Cir. 2003). NCIS admits that its classification of George Ester as exempt while he was a GS-7 was a violation. Tr. at 279:8-11 (Cruz). Further, NCIS failed to pay FLSA overtime to Ester when they changed his classification to non-exempt as a GS-9; instead, he only received AUO premium pay. Tr. at 413:18-415:9 (Ester). NCIS's head of classification testified at trial that this constituted a violation of the FLSA. Tr. at 263:10-16 (Cruz). These violations show that NCIS lacked mechanisms for preventing even blatant violations of the FLSA, thereby confirming its failure to take adequate steps to ensure compliance.

---

[2]     Specifically, NCIS sent letters advising OPM that three criminal investigators who had been employed at NCIS at grades ranging from GS-7 to GS-12 were non-exempt under the FLSA because, in each case, the agency concluded that the employee in question was a "line investigator, performing the basic production work of the Agency, namely, criminal and counterintelligence investigations and operations." *See* App. C. Yet, Cruz testified in her deposition and at trial that Shea's performance of production work and involvement in investigations supported the Agency's exemption decision. Tr. at 241:10-21, 275:24-276:5. The Court may take notice of the OPM documents because public records and government documents available from reliable sources on the Internet" are generally subject to judicial notice." *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 260 (2011) (internal citations omitted).

**5. NCIS's reclassification of the Investigations Specialist position supports a ruling for Shea on the liquidated damages issue.**

Finally, on the eve of trial, NCIS reclassified the entire Investigations Specialist team as non-exempt. ECF No. 43. Although NCIS insists otherwise, its decision should be taken as evidence that NCIS was aware that it was violating the FLSA with respect to the classification of Shea and his team members.

NCIS does not identify any change in Shea's duties, or those of his team members, justifying a change in classification. NCIS suggests, however, that the change is mere a discretionary "policy" decision and thus does not reflect an assessment of how the law applies to the team. The Court should reject this assertion because it contradicts the regulations that govern NCIS's classification decisions. Those regulations prohibit agencies from determining classification as a matter of discretionary policy. *See* 5 C.F.R. § 551.202 (non-exempt employees must be categorized as non-exempt and exempt employees must be categorized as exempt); *see also* 5 C.F.R. § 550.1101 *et seq.* (wage payments made to federal employees in excess of their legal entitlement are overpayments subject to repayment as debts to the government).

Further, the process by which NCIS reclassified the position provides additional evidence of its inadequate implementation of the FLSA. The decision was apparently made by senior management without consulting Cruz, and Cruz was unaware of any basis for it. Tr. at 386:24-389:9. This was a deviation from NCIS's normal processes. Thus, NCIS's decision shows that it is willing to disregard its own internal processes in determining FLSA classification.

29

In addition, we note that NCIS withheld discoverable information that may have further supported Shea's position on the liquidated damages issue. Specifically, NCIS withheld a revised position description, which may have demonstrated NCIS's awareness that Shea's prior position description—the sole basis for Cruz's assessment of Shea's classification—was not accurate. Shea demonstrated the discoverability of this document in a motion to compel and reply brief, which Shea incorporates here. *See* ECF Nos. 42, 44. The trial record confirms Shea's argument, demonstrating that NCIS was revising the position description for reasons unrelated to this or any other lawsuit, thereby barring NCIS's assertion of privilege. Tr. at 280:25-281:5 (Cruz). Thus, if the Court is inclined to rule against Shea on liquidated damages, it should first order NCIS to produce the revised position description and allow the parties to submit briefs regarding its significance.

### D.  Given the evidence presented at trial, the Court should reconsider its grant of summary judgment to the Government as to willfulness.

At an earlier stage of the case, the Court granted summary judgment to the Government on the issue of its willfulness in violating the FLSA. SJ Order, at 21-22. In light of evidence presented at trial, the Court should reconsider that decision.

At any point "before the entry of a final judgment," a court may "reconsider and modify an interlocutory order." *Precision Pine & Timber, Inc. v. United States*, 81 Fed. Cl. 235 (2007). Any such reconsideration is not governed by the stringent standards for altering a judgment, but rather by the "more flexible standards of the 'law of the case'" doctrine. *Florida Power & Light Co. v. United States*, 66 Fed. Cl. 93, 96 (2005). For example, the Court may reconsider its prior decision due to "new and different evidence." *Wolfchild v. United States*, 72 Fed. Cl. 511, 524 (2006).

Meanwhile, to prove willfulness, the plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Reckless disregard occurs, for example, if the employer "fail[ed] to make adequate inquiry into whether its conduct is in compliance with the Act." *Bull v. United States*, 68 Fed. Cl. 212, 273 (2005) (quoting 5 C.F.R. § 551.104).

### 1. The trial record shows that NCIS violated the FLSA in a willful manner.

The trial record provides ample reason to revisit the issue of willfulness. The record suggests that NCIS did not "make adequate inquiry" into its compliance with the FLSA prior to the filing of this lawsuit. *Bull,* 68 Fed. Cl. at 273. For example, the record demonstrates that NCIS committed two blatant violations of the Act that could have been caught by any cursory examination of its conduct: classifying a GS-7 Investigations Specialist as an exempt administrative worker and then failing to pay that employee in accordance with the FLSA even after his status changed to non-exempt. *See supra* at ___. NCIS's failure to identify these clear violations demonstrates that it either did not care whether it complied with the FLSA or failed to take even basic steps to do so, thereby supporting a finding of willfulness. *Bull*, 68 Fed. Cl. at 273; *Chao*, 346 F.3d at 918-19 (noting that "former FLSA violations" support a finding of willfulness).

Courts have found willfulness where the employer "never studied whether [plaintiffs] were exempt executives" and relied on a longstanding prior policy despite having "no idea who made that policy." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1253, 1280 (11th Cir. 2008). That is precisely what happened here: NCIS apparently made no effort to assure its compliance with the FLSA prior to the filing of this suit, and instead

relied on a prior classification without knowing how it was made or by whom. *See supra* at

___.

Likewise, willfulness can be shown by an employer's disregard for "DOL's repeated and consistent interpretations of the FLSA," *Abadeer v. Tyson Foods, Inc.*, 975 F. Supp. 2d 890, 912 (M.D. Tenn. 2013). Here, Cruz admitted that in assessing Shea's classification, she relied on an incorrect premise at odds with the plain text of the governing regulations: that an employee's performance of production work supports a finding of exempt status. Tr. at 375:21-376:9; *see* 5 C.F.R. § 551.206. NCIS also ignored a DOL regulation plainly stating that surveillance work is non-exempt, even if the employee directs the work of other employees. *See supra* at ___. Thus, the Court may conclude that Cruz either failed to read these regulations or read and ignored them. Either scenario reflects reckless disregard.

Further evidence of willfulness comes from Cruz's attempt to defend Shea's classification with "no personal knowledge of [the plaintiff's] actual job duties." *See Cook v. Carestar, Inc.*, No. 2:11-CV-00691, 2013 WL 5477148, *12 (S.D. Ohio Sept. 16, 2013) (finding willfulness). Cruz relied solely on Shea's position description, and never sought further information about Shea's duties, *see supra* at ___, despite regulations stating that the exemption determination "must ultimately rest on the duties actually performed by the employee." 5 C.F.R. § 551.202(e).

Finally, NCIS ultimately decided to reclassify Shea and his teammates as non-exempt on the eve of trial, Tr. at 386:24-387:11 (Cruz), thereby reflecting an awareness that NCIS had misclassified the team. NCIS's history of shifting and inconsistent positions provides further evidence of willfulness.

**2. The trial record contradicts the factual basis for the Court's prior decision on willfulness.**

Further, the trial record contradicts the factual predicates of the Court's prior decision. First, in its discussion of willfulness, the Court noted an absence of evidence that Shea "raised concerns to Mr. Freeman or others at NCIS that he was wrongly classified as exempt." SJ Order at 21 n.16. But the record now conclusively shows that both Shea and Freeman did complain about overtime pay for the Special Surveillance Team, which had been an ongoing issue for years. *See supra* at ___. Although these complaints did not specifically assert FLSA misclassification, they put NCIS on notice of potential issues related to overtime pay.

The Court also noted in its prior decision that "Mr. Shea and Mr. Freeman did not flag to the agency that [the position description] was out of date or that his job duties had changed." SJ Order at 21. But in reaching this conclusion, the Court apparently credited testimony that the employee and supervisor annually examined the position description to see whether it was accurate. SJ Order at 7. The trial record now demonstrates that no such examination ever occurred. Tr. at 103:20-104:12 (Shea); 350:3-23 (Freeman). Further, even if NCIS had no reason to question the accuracy of the position description, that is a separate issue from whether the agency had reason to question the position's classification as exempt. The latter issue should be the focus of the willfulness inquiry.

Finally, the Court relied on the notion that "NCIS's classifiers follow a process that involves referencing the governing regulations and other interpretive guidance and analyzing the exemption as it applies to each employee's position description." SJ Order, at 21-22. But the trial record makes clear that no such process occurred with respect to the

Investigations Specialist position prior to the filing of this lawsuit. *See supra* at ___. Thus, the asserted process not preclude a finding of willfulness.

In short, after a full airing of the facts, the record firmly supports a finding of willfulness. The Court should therefore withdraw its prior decision on that issue. To determine the additional damages to which Shea is entitled pursuant to a willfulness finding, the Court should order the parties to submit supplemental briefing.

### E.  Shea is entitled to attorneys' fees and costs.

Under 29 U.S.C. § 216(b), when a court finds a violation of the FLSA, it "shall . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." Attorneys' fees and costs are thus mandatory should the court rule in favor of Shea as to liability. If the Court finds that Shea is non-exempt, it should order Shea to submit a petition setting forth his requested fees and costs.

### CONCLUSION

Based on the evidence presented at trial and the legal authorities presented above, the Court should rule that (1) Shea is not an exempt administrative worker and was thus entitled to overtime pay under the FLSA, (2) Shea is entitled to back wages equal to the difference between the total he received in AUO premiums and the total he would have received under the FLSA, in an amount to be determined based on the pay records submitted to the Court and any additional overtime hours worked by Shea after the creation of those records, (3) Shea is entitled to 100% liquidated damages because NCIS did not establish reasonable grounds or good faith with respect to the classification decision, (4) Shea is entitled to damages extending three years prior to the filing of the

lawsuit because NCIS willfully violated the FLSA, and (5) Shea is entitled to reasonable attorneys' fees and costs, to be determined upon submission of a petition.

Dated: February 8, 2019                    Respectfully Submitted,

/s/ Linda Lipsett
Linda Lipsett (Counsel of Record)
Bernstein & Lipsett, P.C.
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
Telephone: (202) 296-1798
Facsimile:  (202) 496-0555
chouse@bernstein-lipsett.com

Daniel M. Rosenthal
Nari E. Ely
James & Hoffman
1130 Connecticut Avenue, N.W., Suite 950
Washington, D.C. 20036
Telephone: (202) 296-1798
Facsimile:  (202) 496-0555
dmrosenthal@jamhoff.com
neely@jamhoff.com

# APPENDIX A

| Mission Name | Length in days per Freeman's list (Ex. P25) | Shea designated as team lead per Freeman's list (Ex. P25) | Shea designated as team lead per list and Freeman testimony | Shea designated as team lead per list and Freeman, Shea, and Sevigny testimony |
|---|---|---|---|---|
| Tropical Margarita | 22 | No | No | No |
| Rogue Archer | 20 | Yes | Yes | Yes |
| Indelible Stain | 15 | No | No | No |
| Mojave Red[1] | 10 | Yes | No[1] | No[1] |
| Sea Wolves | 6 | Yes | Yes | Yes |
| NY Fleet Week | 10 | No | No | No |
| Mojave Red | 9 | Yes | Yes | Yes |
| React Support | 3 | No | No | No |
| Stable Pulse | 5 | No | No | No |
| Rogue Archer[2] | 33 | Yes | Yes | Yes, in part[2] |
| Modern Day Marine Expo | 3 | No | No | No |
| S/Owolabi | 8 | No | No | No |
| S/Pollard | 11 | No | No | No |
| Silent Warrior | 11 | No | No | No |
| Silent Monument | 4 | No | No | No |
| Mojave Red | 12 | Yes | Yes | Yes |
| Mojave Red (Air) | 6 | No | No | No |
| West Star | 4 | No | No | No |
| S/Thomas-Chambers | 17 | No | No | No |
| Mojave Red | 10 | Yes | Yes | Yes |
| Rogue Archer[3] | 7 | Yes | Yes | No[3] |
| Silent Monument | 12 | No | No | No |
| Local | 5 | No | No | No |
| Stable Quest | 16 | No | No | No |
| Local | 6 | No | No | No |
| S/Usman | 10 | No | No | No |
| Sea-Air-Space Expo | 3 | No | No | No |
| NY Fleet Week | 10 | No | No | No |
| Sea Wolves | 14 | Yes | Yes | Yes |
| Silent Monument | 6 | No | No | No |
| Intl Seapower Symposium | 7 | No | No | No |
| Modern Day Marine Expo | 4 | No | No | No |
| Baltimore Fleet Week | 3 | No | No | No |
| S/Jex | 9 | No | No | No |
| Triton's Chatter | 10 | No | No | No |
| Network Trap | 9 | No | No | No |
| DON'T RECALL | 3 | No | No | No |
| Cold Whisper[4] | 17 | Yes | Yes | No[4] |
| Sea-Air-Space Expo | 3 | No | No | No |
| DON'T RECALL | 5 | Yes | Yes | Yes |
| Ops Support | 7 | No | No | No |
| Poly Support[5] | 3 | Yes | Yes | No[5] |
| Arbor Mist | 7 | No | No | No |
| New York Fleet Week | 0 | No | No | No |
| Run Amuck | 58 | No | No | No |
| Modern Day Marine Expo | 3 | No | No | No |

37

**Appendix A**

| Mission Name | Length in days per Freeman's list (Ex. P25) | Shea designated as team lead per Freeman's list (Ex. P25) | Shea designated as team lead per list and Freeman testimony | Shea designated as team lead per list and Freeman, Shea, and Sevigny testimony |
|---|---|---|---|---|
| Cold Whisper[6] | 1 | **Yes** | No[6] | No[6] |
| Cold Whisper[6] | 1 | **Yes** | No[6] | No[6] |
| Tin Roof | 7 | No | No | No |
| V/Rouse | 7 | No | No | No |
| Constant Echo | 10 | No | No | No |
| Stable Quest | 8 | **Yes** | **Yes** | **Yes** |
| Mystic Crane | 12 | **Yes** | **Yes** | **Yes** |
| Stable Quest | 12 | **Yes** | **Yes** | **Yes** |
| Silent Monument | 11 | No | No | No |
| Sea-Air-Space Expo | 3 | No | No | No |
| Rust Ewok | 8 | No | No | No |
| Stable Quest | 11 | **Yes** | **Yes** | **Yes** |
| Local (Internal) | 7 | No | No | No |
| Ops Support | 20 | No | No | No |

38

# APPENDIX B

**Appendix B**

| | Total | Shea designated as team lead on Freeman's list (Ex. P25) | Shea designated as team lead per list and Freeman testimony | Shea designated as team lead per list and Freeman, Shea, and Sevigny testimony |
|---|---|---|---|---|
| **# Missions** | 60 | 18 | 15 | 11.5 |
| **% Missions** | | 30% | 25% | 19% |
| **# Days** | 574 | 191 | 179 | 126 |
| **% Days** | | 33% | 31% | 22% |

# APPENDIX C



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

Merit System
Accountability and
Compliance

---

# U.S. Office of Personnel Management
## Fair Labor Standards Act Decision
### Under section 204(f) of title 29, United States Code

| | |
|---|---|
| **Claimant:** | Michael P. Hayes |
| **Agency Classification:** | Criminal Investigator<br>GS-1811-7/9/11/12 |
| **Organization:** | Department of the Navy |
| **Claim:** | Position should be nonexempt, thus due FLSA overtime pay |
| **OPM decision:** | Nonexempt; potentially due FLSA overtime pay |
| **OPM decision number:** | F-1811-12-05 |

---

Linda Kazinetz
Classification Appeals and FLSA Claims
Program Manager
Agency Compliance and Evaluation
Merit System Accountability and Compliance

March 16, 2017
Date

42

OPM decision number F-1811-12-05                                        ii

As provided in section 551.708 of title 5, Code of Federal Regulations (CFR), this decision is
binding on all administrative, certifying, payroll, disbursing, and accounting officials of agencies
for which the Office of Personnel Management (OPM) administers the Fair Labor Standards Act
(FLSA).  The agency should identify all similarly situated current and, to the extent possible,
former employees, ensure that they are treated in a manner consistent with this decision, and
inform them in writing of their right to file an FLSA claim with the agency or OPM.  There is no
further right of administrative appeal.  This decision is subject to discretionary review only under
conditions and time limits specified in 5 CFR 551.708 (address provided in section 551.710).
The claimant has the right to bring action in the appropriate Federal court if dissatisfied with this
decision.

The agency is to review whether the claimant has worked overtime in accordance with
instructions in the "Decision" section of this decision, and if the claimant is determined to be
entitled to back pay, the agency must pay the claimant the amount owed him.  If the claimant
believes the agency has incorrectly computed the amount owed him, he may file a new FLSA
claim with this office.

**Introduction**

On May 9, 2012, the U.S. Office of Personnel Management (OPM) received a letter dated May 9, 2012, from the Law Offices of Bernstein & Lipsett, P.C. (B & L), the claimant's duly appointed representative, concerning a Fair Labor Standards Act (FLSA) claim they had initially filed on the claimant's behalf with the General Accounting Office (GAO), now the U.S. Government Accountability Office, on January 27, 1993, and subsequently with OPM on or about September 9, 1999, challenging his exemption status under the FLSA when he was employed as a Criminal Investigator, GS-1811, at the GS-7 through GS-12 grade levels with the Department of the Navy.  The claimant was a plaintiff in a lawsuit filed in the U.S. Court of Federal Claims at approximately the same time the administrative claim was filed with GAO. Based on information provided by B & L, the claimant was awarded back pay under a settlement agreement for the pay period ending September 5, 1992, to the pay period ending December 12, 1992, and for the pay period ending December 26, 1992, to the pay period ending October 29, 1994, subject to the two-year statute of limitations for FLSA claims under 29 United States Code (U.S.C.) 255(a).

B & L has requested OPM adjudicate the administrative claim filed with OPM and asserts that, because the claimant served in the military during the Gulf War, the statute of limitations applicable to this claim is the five-year statute of limitations under 31 U.S.C. 3702(b)(2) rather than the two-year statute of limitations (three years for willful violations) applicable to FLSA administrative claims filed under the Barring Act.  *See* 73 Comp. Gen 157 (May 23, 1994); 31 U.S.C. 3702(b); 29 U.S.C. 255(a).  B & L states the claimant was called to active duty with the United States Marine Corps Reserve "from approximately November 13, 1990 to July 31, 1991" in connection with Operation Desert Shield/Storm and, citing the provisions of 31 U.S.C. 3702(b)(2), asserts:  "[H]e is entitled to retroactive back pay and interest … for the period he was employed prior to the commencement of the Gulf War on August 2, 1990, in addition to the period he was employed by the NIS [Naval Investigative Service][1] after the commencement of the Gulf War, up to the date he recovered under previous FLSA settlements. This period includes September 30, 1985 to July 27, 1991, less Mr. Hayes's active duty military service time, for which he does not seek recovery."

**Background**

We previously accepted and decided six similar claims under section 4(f) of the FLSA, as amended, codified at section 204(f) of title 29, U.S.C., which we denied as time barred. Subsequently, claimant's representative brought suit under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*, and 701 *et seq.*) in the United States District Court for the District of Columbia, alleging that OPM wrongfully applied a two-year statute of limitations in denying their administrative claims for unpaid FLSA overtime pay.  *Armstrong v. Archuleta,* 77 F.Supp.3d 9 (December 30, 2014).  In relevant part, the court stated in its opinion:

> All Plaintiffs are deemed to have timely filed their claims as of the date of their filings with the Claims Court. As a result, Plaintiffs . . . can recover for the entire claim period under the five-year statute of limitations—that is, for all claims that accrued within five

---

[1]NIS was the predecessor agency of the current Naval Criminal Investigative Service (NCIS).

OPM decision number F-1811-12-05                                                    2

years before the Gulf War commenced on August 2, 1990—minus monies paid under
their DOJ Settlements.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[T]he case is remanded to OPM to adjudicate and process damages in accordance with
FLSA and other applicable laws, and Plaintiffs' respective employing agencies are
directed to compensate them in accordance with OPM's determinations.

Consistent with the holding in the *Armstrong* case, we will apply the five-year statute of
limitations and corrective methodology (subtracting monies already received under prior
settlements or judgments) to the claims of similarly-situated claimants we find to be FLSA non-
exempt and potentially due FLSA overtime pay.

**Analysis**

Under the provisions of 5 CFR 551.706, OPM determines the facts necessary to adjudicate a
claim. Applying the court's mandate to determine whether the claimant is owed overtime pay
under the FLSA, we must first determine whether the work performed during the claim period is
exempt or nonexempt from the overtime pay provisions of the FLSA. On October 1, 2015, in
response to the aforementioned court decision, OPM requested an agency administrative report
from NCIS regarding this FLSA claim. By letter dated May 6, 2016, NCIS advised OPM based
on their fact-finding that:

The implementing regulations in force at the time provide that exemption criteria shall be
narrowly construed and that the burden of proof rests with the agency that asserts the
exemption. 5 C.F.R. § 551.202 (1984). The implementing regulations set forth four
exemptions: 1) the executive exemption, which applies to managers; 2) the administrative
exemption, which is applicable to "advisors, assistants or specialists in a management or
general business function or supporting service;" 3) the professional exemption, which
applies primarily to teachers and certain designated classes of professions; and 4) the foreign
exception [sic], applicable to employees permanently stationed outside of the United States
and its territories. 29 C.F.R. §§ 551.205-551.208.

SA [Special Agent] Hayes, to the Agency's best knowledge, was at all times during the
applicable period, a line investigator, performing the basic production work of the Agency,
namely, criminal and counterintelligence investigations and operations. He was not a
manager, so the executive exemption would not apply. He was not an "advisor, assistant or
representative of management, or a specialist in a management or general business function
or supporting service." In addition, his primary duties did not consist of work that
"significantly affects the formulation or execution of management policies or programs."
Thus, the administrative exemption set forth in 29 C.F.R. § 551.205 is inapplicable. Federal
Personnel Manual Letter No. 551-1, Attachment 2 does not define the 1811 job series as a
professional occupation. Thus, the professional exemption does not apply. The foreign
exemption does not apply as SA Hayes's duty station was always stateside during the
applicable time period.

OPM decision number F-1811-12-05                                                          3

> Based on the foregoing, we conclude that SA Hayes should have been treated as nonexempt during the applicable time period.

Based on careful review of the record, we concur with the agency's determination. The claimant is requesting compensation for work performed from September 30, 1985, to July 27, 1991, less his active duty military service time.[2]  Therefore, Navy would have been potentially required to compensate the claimant under the overtime pay provisions of Subpart E of Part 551 of 5 CFR for work performed within the claim period; i.e., within five years prior to the commencement of the Gulf War on August 2, 1990, and subject to deduction for any monies paid under the claimant's DOJ settlement agreements.  In this case, the entire claim period (September 30, 1985 to July 27, 1991) is covered.

The claimant's Standard Form (SF) 50s documenting his employment with Navy indicate he was a nonexempt employee from his appointment on September 30, 1985, until August 17, 1986, when he was reassigned to a different position description (PD), at which time the agency states "[b]oth the new PD and the SF-50 indicated that he was an "exempt" employee."  Absent an assertion by the claimant that he was not paid at the FLSA overtime rate during the period of time he was designated as nonexempt, we must conclude that he was properly compensated under the FLSA during this period, i.e., September 30, 1985, to August 16, 1986.

**Decision**

The claimant's work is FLSA nonexempt (i.e., covered by FLSA overtime provisions), and he is entitled to compensation for all overtime hours worked at the FLSA overtime rate for the period of the claim he was designated as FLSA exempt, i.e., August 17, 1986, to July 27, 1991, less his active duty military service time from November 13, 1990, to July 31, 1991.  Since his previous FLSA settlements were for time periods subsequent to July 27, 1991, they are not germane to the overtime pay calculations for the period of the claim covered by this decision.  The agency must follow the compliance requirements on page ii of this decision.

The claimant must submit evidence showing the amount and extent of overtime that was performed as provided for in 5 CFR 551.706(a) as informed by the agency payroll records submitted to OPM and the claimant on September 16, 2016.  The agency will have the opportunity to review this evidence using any other sources of information available, including witnesses, before a determination is made as to whether the claimant is entitled to any back pay under the FLSA and any interest as required under 5 CFR part 550, subpart H.[3]  Any petition for attorney's fees and expenses must be submitted to the agency out of which this claim arose.

---

[2] The claimant's Certificate of Release or Discharge from Active Duty, DD Form 214, included with his claim shows he was in an active duty status from November 13, 1990, to July 31, 1991.
[3] The agency's overtime and interest calculations must account for the claimant's prior receipt of administratively uncontrollable overtime, documented as 25 percent on his SF-50s covering the claim period, using the principles contained within 29 U.S.C. 207(k), 5 CFR 551.501(a)(1) and (5), and 5 CFR 551.541(a).  OPM's Fact Sheet on the topic can be found at https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/guidance-on-applying-flsa-overtime-provisions-to-law-enforcement-employees-receiving-administratively-uncontrollable-overtime-pay/.46

OPM decision number F-1811-12-05                                                                4

Should the claimant be determined to be entitled to back pay which the claimant believes to be incorrectly computed, the claimant may file a new FLSA claim with this office.

OPM decision number F-1811-12-05                                    5

## Distribution

Mr. Jules Bernstein and Ms. Linda Lipsett
Law Offices
Bernstein & Lipsett, P.C.
1130 Connecticut Avenue, NW
Suite 950
Washington, DC  20036-1798

Mr. Michael P. Hayes
48371 Ludlum Court
Ashburn, VA  20147

Ms. Kathryn Good
Kathryn.good@ncis.navy.mil

Mr. David P. Pedersen
David.p.pedersen@navy.mil

Ms. Stacey Cruz
Stacey.cruz@ncis.navy.mil



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

Merit System
Accountability and
Compliance

---

## U.S. Office of Personnel Management
## Fair Labor Standards Act Decision
## Under section 204(f) of title 29, United States Code

| | |
|---:|:---|
| **Claimant:** | John J. McGuire |
| **Agency Classification:** | Criminal Investigator<br>GS-1811-7/9/11 |
| **Organization:** | Department of the Navy |
| **Claim:** | Position should be nonexempt, thus due<br>FLSA overtime pay |
| **OPM decision:** | Nonexempt; potentially due FLSA<br>overtime pay |
| **OPM decision number:** | F-1811-11-02 |

---

Linda Kazinetz
Classification Appeals and FLSA Claims
    Program Manager
Agency Compliance and Evaluation
Merit System Accountability and Compliance

March 16, 2017
Date

49

OPM decision number F-1811-11-02                                                                ii

As provided in section 551.708 of title 5, Code of Federal Regulations (CFR), this decision is
binding on all administrative, certifying, payroll, disbursing, and accounting officials of agencies
for which the Office of Personnel Management (OPM) administers the Fair Labor Standards Act
(FLSA).  The agency should identify all similarly situated current and, to the extent possible,
former employees, ensure that they are treated in a manner consistent with this decision, and
inform them in writing of their right to file an FLSA claim with the agency or OPM.  There is no
further right of administrative appeal.  This decision is subject to discretionary review only under
conditions and time limits specified in 5 CFR 551.708 (address provided in section 551.710).
The claimant has the right to bring action in the appropriate Federal court if dissatisfied with this
decision.

The agency is to review whether the claimant has worked overtime in accordance with
instructions in the "Decision" section of this decision, and if the claimant is determined to be
entitled to back pay, the agency must pay the claimant the amount owed him.  If the claimant
believes the agency has incorrectly computed the amount owed him, he may file a new FLSA
claim with this office.

OPM decision number F-1811-11-02                                                        1

**Introduction**

On June 4, 2012, the U.S. Office of Personnel Management (OPM) received a letter dated June 4, 2012, from the Law Offices of Bernstein & Lipsett, P.C. (B & L), the claimant's duly appointed representative, concerning a Fair Labor Standards Act (FLSA) claim they had initially filed on the claimant's behalf with the General Accounting Office (GAO), now the U.S. Government Accountability Office, on September 8, 1992, and subsequently with OPM on October 20, 1999, challenging his exemption status under the FLSA when he was employed as a Criminal Investigator, GS-1811, at the GS-7 through GS-11 grade levels with the Department of the Navy.  The claimant was a plaintiff in a lawsuit filed in the U.S. Court of Federal Claims at approximately the same time the administrative claim was filed with GAO.  Based on information provided by B & L, the claimant was awarded back pay under a settlement agreement for the pay period ending September 8, 1990, to the pay period ending October 29, 1994, subject to the two-year statute of limitations for FLSA claims under 29 United States Code (U.S.C.) 255(a).

B & L has requested OPM adjudicate the administrative claim filed with OPM and asserts that, because the claimant served in the military during the Gulf War, the statute of limitations applicable to this claim is the five-year statute of limitations under 31 U.S.C. 3702(b)(2) rather than the two-year statute of limitations (three years for willful violations) applicable to FLSA administrative claims filed under the Barring Act.  *See* 73 Comp. Gen 157 (May 23, 1994); 31 U.S.C. 3702(b); 29 U.S.C. 255(a).  B & L states the claimant was called to active duty with the United States Marine Corps Reserve "from approximately January 9, 1991 to May 12, 1991" in connection with Operation Desert Shield/Storm and, citing the provisions of 31 U.S.C. 3702(b)(2), asserts:  "[H]e is entitled to retroactive back pay and interest … for the period he was employed prior to the commencement of the Gulf War on August 2, 1990, in addition to the time he was employed by NCIS [Naval Criminal Investigative Service][1] after the commencement of the Gulf War, up to the date he recovered under previous FLSA settlements. This period includes August 3, 1987 to August 25, 1990, less Mr. McGuire's active duty military service time, for which he does not seek recovery."

**Background**

We previously accepted and decided six similar claims under section 4(f) of the FLSA, as amended, codified at section 204(f) of title 29, U.S.C., which we denied as time barred. Subsequently, claimant's representative brought suit under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*, and 701 *et seq.*) in the United States District Court for the District of Columbia, alleging that OPM wrongfully applied a two-year statute of limitations in denying their administrative claims for unpaid FLSA overtime pay.  *Armstrong v. Archuleta,* 77 F.Supp.3d 9 (December 30, 2014).  In relevant part, the court stated in its opinion:

> All Plaintiffs are deemed to have timely filed their claims as of the date of their filings with the Claims Court. As a result, Plaintiffs . . . can recover for the entire claim period

---

[1] The claimant was employed by the Naval Investigative Service (NIS), which was the predecessor agency of the current Naval Criminal Investigative Service (NCIS).

under the five-year statute of limitations—that is, for all claims that accrued within five years before the Gulf War commenced on August 2, 1990—minus monies paid under their DOJ Settlements.

****************

[T]he case is remanded to OPM to adjudicate and process damages in accordance with FLSA and other applicable laws, and Plaintiffs' respective employing agencies are directed to compensate them in accordance with OPM's determinations.

Consistent with the holding in the *Armstrong* case, we will apply the five-year statute of limitations and corrective methodology (subtracting monies already received under prior settlements or judgments) to the claims of similarly-situated claimants we find to be FLSA non-exempt and potentially due FLSA overtime pay.

**Analysis**

Under the provisions of 5 CFR 551.706, OPM determines the facts necessary to adjudicate a claim. Applying the court's mandate to determine whether the claimant is owed overtime pay under the FLSA, we must first determine whether the work performed during the claim period is exempt or nonexempt from the overtime pay provisions of the FLSA. On October 1, 2015, in response to the aforementioned court decision, OPM requested an agency administrative report from NCIS regarding this FLSA claim. By letter dated May 6, 2016, NCIS advised OPM based on their fact-finding that:

The implementing regulations in force at the time provide that exemption criteria shall be narrowly construed and that the burden of proof rests with the agency that asserts the exemption. 5 C.F.R. § 551.202 (1984). The implementing regulations set forth four exemptions: 1) the executive exemption, which applies to managers; 2) the administrative exemption, which is applicable to "advisors, assistants or specialists in a management or general business function or supporting service;" 3) the professional exemption, which applies primarily to teachers and certain designated classes of professions; and 4) the foreign exception [sic], applicable to employees permanently stationed outside of the United States and its territories. 29 C.F.R. §§ 551.205-551.208 (1984).

SA [Special Agent] McGuire, to the Agency's best knowledge, was at all times during the applicable period, a line investigator, performing the basic production work of the Agency, namely, criminal and counterintelligence investigations and operations. He was not a manager, so the executive exemption would not apply. He was not an "advisor, assistant or representative of management, or a specialist in a management or general business function or supporting service." In addition, his primary duties did not consist of work that "significantly affects the formulation or execution of management policies or programs." Thus, the administrative exemption set forth in 29 C.F.R. § 551.205 is inapplicable. Federal Personnel Manual Letter No. 551-1, Attachment 2 does not define the 1811 job series as a professional occupation. Thus, the professional exemption does not apply. The foreign exemption does not apply as SA McGuire's duty station was in the Philadelphia NISRA during the applicable time period.

> Based on the foregoing, we conclude that SA McGuire should have been treated as
> nonexempt during the applicable time period.

Based on careful review of the record, we concur with the agency's determination. The claimant is requesting compensation for work performed from August 3, 1987, to August 25, 1990, less his active duty military service time.[2] Therefore, Navy would have been potentially required to compensate the claimant under the overtime pay provisions of Subpart E of Part 551 of 5 CFR for work performed within the claim period; i.e., within five years before the commencement of the Gulf War on August 2, 1990, and subject to deduction for any monies paid under the claimant's DOJ settlement agreement. In this case, the entire claim period (August 3, 1987, to August 25, 1990) is covered.

The claimant's Standard Form (SF) 50s documenting his employment with Navy indicate he was a nonexempt employee from his appointment on August 3, 1987, until October 25, 1987, when he was reassigned to a different position description (PD) and the agency states "[t]he reassignment SF-50 indicates that SA McGuire is an exempt employee." The copy of the appointment SF-50 provided by the agency supports this conclusion. Absent an assertion by the claimant that he was not paid at the FLSA overtime rate during the period of time he was designated as nonexempt, we must conclude that he was properly compensated under the FLSA during this period, i.e., August 3, 1987, to October 24, 1987.

**Decision**

The claimant's work is FLSA nonexempt (i.e., covered by FLSA overtime provisions), and he is entitled to compensation for all overtime hours worked at the FLSA overtime rate for the period of the claim he was designated as FLSA exempt, i.e., October 25, 1987, to August 25, 1990. Since both his active duty military service time and his previous FLSA settlement were for time periods subsequent to August 25, 1990, they are not germane to the overtime pay calculations for the period of the claim covered by this decision. The agency must follow the compliance requirements on page ii of this decision.

The claimant must submit evidence showing the amount and extent of overtime that was performed as provided for in 5 CFR 551.706(a) as informed by the agency payroll records submitted to OPM and the claimant on September 16, 2016. The agency will have the opportunity to review this evidence using any other sources of information available, including witnesses, before a determination is made as to whether the claimant is entitled to any back pay under the FLSA and any interest as required under 5 CFR part 550, subpart H.[3] Any petition for

---

[2] The claimant's Certificate of Release or Discharge from Active Duty, DD Form 214, included with his claim shows he was in an active duty status from January 9, 1991, to May 12, 1991.
[3] The agency's overtime and interest calculations must account for the claimant's prior receipt of administratively uncontrollable overtime, documented as 25 percent on his SF-50s covering the claim period, using the principles contained within 29 U.S.C. 207(k), 5 CFR 551.501(a)(1) and (5), and 5 CFR 551.541(a). OPM's Fact Sheet on the topic can be found at https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/guidance-

OPM decision number F-1811-11-02                                                  4

attorney's fees and expenses must be submitted to the agency out of which this claim arose. Should the claimant be determined to be entitled to back pay which the claimant believes to be incorrectly computed, the claimant may file a new FLSA claim with this office.

---

on-applying-flsa-overtime-provisions-to-law-enforcement-employees-receiving-administratively-uncontrollable-overtime-pay/.54

OPM decision number F-1811-11-02                                                          5

## Distribution

Mr. Jules Bernstein and Ms. Linda Lipsett
Law Offices
Bernstein & Lipsett, P.C.
1130 Connecticut Avenue, NW
Suite 950
Washington, DC  20036-1798

Mr. John J. McGuire
8 Sugar Mill Court
Sewell, NJ  08080

Ms. Kathryn Good
Kathryn.good@ncis.navy.mil

Mr. David P. Pedersen
David.p.pedersen@navy.mil

Ms. Stacey Cruz
Stacey.cruz@ncis.navy.mil



UNITED STATES OFFICE OF PERSONNEL MANAGEMENT
Washington, DC 20415

Merit System
Accountability and
Compliance

# U.S. Office of Personnel Management
## Fair Labor Standards Act Decision
### Under section 204(f) of title 29, United States Code

| | |
|---|---|
| **Claimant:** | Joseph C. Noone |
| **Agency Classification:** | Criminal Investigator<br>GS-1811-11/12 |
| **Organization:** | Department of the Navy |
| **Claim:** | Position should be nonexempt, thus due FLSA overtime pay |
| **OPM decision:** | Nonexempt; potentially due FLSA overtime pay |
| **OPM decision number:** | F-1811-12-06 |

Linda Kazinetz
Classification Appeals and FLSA Claims
    Program Manager
Agency Compliance and Evaluation
Merit System Accountability and Compliance

March 16, 2017
Date

56

OPM decision number F-1811-12-06                                                    ii

As provided in section 551.708 of title 5, Code of Federal Regulations (CFR), this decision is binding on all administrative, certifying, payroll, disbursing, and accounting officials of agencies for which the Office of Personnel Management (OPM) administers the Fair Labor Standards Act (FLSA).  The agency should identify all similarly situated current and, to the extent possible, former employees, ensure that they are treated in a manner consistent with this decision, and inform them in writing of their right to file an FLSA claim with the agency or OPM.  There is no further right of administrative appeal.  This decision is subject to discretionary review only under conditions and time limits specified in 5 CFR 551.708 (address provided in section 551.710).  The claimant has the right to bring action in the appropriate Federal court if dissatisfied with this decision.

The agency is to review whether the claimant has worked overtime in accordance with instructions in the "Decision" section of this decision, and if entitled pay the claimant the amount owed him.  If the claimant believes the agency has incorrectly computed the amount owed him, he may file a new FLSA claim with this office.

OPM decision number F-1811-12-06                                           1

**Introduction**

On June 4, 2012, the U.S. Office of Personnel Management (OPM) received a letter dated June 4, 2012, from the Law Offices of Bernstein & Lipsett, P.C. (B & L), the claimant's duly appointed representative, concerning a Fair Labor Standards Act (FLSA) claim they had initially filed on the claimant's behalf with the General Accounting Office (GAO), now the U.S. Government Accountability Office, on October 21, 1994, and subsequently with OPM on or about September 9, 1999, challenging his exemption status under the FLSA when he was employed as a Criminal Investigator, GS-1811, at the GS-11 and GS-12 grade levels with the Department of the Navy.  The claimant was a plaintiff in a lawsuit filed in the U.S. Court of Federal Claims at approximately the same time the administrative claim was filed with GAO. Based on information provided by B & L, the claimant was awarded back pay under a settlement agreement for the pay period ending October 21, 1992, to the pay period ending October 29, 1994, subject to the two-year statute of limitations for FLSA claims under 29 United States Code (U.S.C.) 255(a).

B & L has requested OPM adjudicate the administrative claim filed with OPM and asserts that, because the claimant served in the military during the Gulf War, the statute of limitations applicable to this claim is the five-year statute of limitations under 31 U.S.C. 3702(b)(2) rather than the two-year statute of limitations (three years for willful violations) applicable to FLSA administrative claims filed under the Barring Act.  *See* 73 Comp. Gen 157 (May 23, 1994); 31 U.S.C. 3702(b); 29 U.S.C. 255(a).  B & L states the claimant was called to active duty with the United States Marine Corps Reserve "from approximately March 11, 1991, to June 14, 1991" in connection with Operation Desert Shield/Storm and, citing the provisions of 31 U.S.C. 3702(b)(2), asserts:  "[H]e is entitled to retroactive back pay and interest ... for the period he was employed prior to the commencement of the Gulf War on August 2, 1990, in addition to the period he was employed by Commerce[1] after the commencement of the Gulf War, up to the date he recovered under previous FLSA settlements.  This period includes August 2, 1985 to October 17, 1992, less Mr. Noone's active duty military service time, for which he does not seek recovery."

**Background**

We previously accepted and decided six similar claims under section 4(f) of the FLSA, as amended, codified at section 204(f) of title 29, U.S.C., which we denied as time barred. Subsequently, claimant's representative brought suit under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*, and 701 *et seq.*) in the United States District Court for the District of Columbia, alleging that OPM wrongfully applied a two-year statute of limitations in denying their administrative claims for unpaid FLSA overtime pay.  *Armstrong v. Archuleta,* 77 F.Supp.3d 9 (December 30, 2014).  In relevant part, the court stated in its opinion:

> All Plaintiffs are deemed to have timely filed their claims as of the date of their filings with the Claims Court. As a result, Plaintiffs . . . can recover for the entire claim period under the five-year statute of limitations—that is, for all claims that accrued within five

---

[1] The claimant was employed by Navy from August 2, 1985, to January 3, 1987, during the claim period.
                                    58

years before the Gulf War commenced on August 2, 1990—minus monies paid under their DOJ Settlements.

***************

> [T]he case is remanded to OPM to adjudicate and process damages in accordance with FLSA and other applicable laws, and Plaintiffs' respective employing agencies are directed to compensate them in accordance with OPM's determinations.

Consistent with the holding in the *Armstrong* case, we will apply the five-year statute of limitations and corrective methodology (subtracting monies already received under prior settlements or judgments) to the claims of similarly-situated claimants we find to be FLSA non-exempt and potentially due FLSA overtime pay.

**Analysis**

Under the provisions of 5 CFR 551.706, OPM determines the facts necessary to adjudicate a claim. Applying the court's mandate to determine whether the claimant is owed overtime pay under the FLSA, we must first determine whether the work performed during the claim period is exempt or nonexempt from the overtime pay provisions of the FLSA. On October 1, 2015, in response to the aforementioned court decision, OPM requested an agency administrative report from the Naval Criminal Investigative Service (NCIS)[2] regarding this FLSA claim. By letter dated May 6, 2016, NCIS advised OPM based on their fact-finding that:

> The implementing regulations in force at the time provide that exemption criteria shall be narrowly construed and that the burden of proof rests with the agency that asserts the exemption. 5 C.F.R. § 551.202 (1984). The implementing regulations set forth four exemptions: 1) the executive exemption, which applies to managers; 2) the administrative exemption, which is applicable to "advisors, assistants or specialists in a management or general business function or supporting service;" 3) the professional exemption, which applies primarily to teachers and certain designated classes of professions; and 4) the foreign exception [sic], applicable to employees permanently stationed outside of the United States and its territories. 29 C.F.R. §§ 551.205-551.208.

> SA [Special Agent] Noone, to the Agency's best knowledge, was at all times during the applicable period, a line investigator, performing the basic production work of the Agency, namely, criminal and counterintelligence investigations and operations. There is no indication that he was ever a manager or supervisor. He was most likely on a standardized Position Description with a full performance level at the GS-12 level. Since there is no indication that he was a manager, the executive exemption would most likely not apply. Similarly, there is no indication that he was an "advisor, assistant or representative of management, or a specialist in a management or general business function or supporting service." In addition, there is no indication that his duties consisted of work that "significantly affects the formulation or execution of management

---

[2] NCIS is the successor agency of the Naval Investigative Service, which employed the claimant during the claim period.

OPM decision number F-1811-12-06                                                                    3

policies or programs." Thus, the administrative exemption set forth in 29 C.F.R. § 551.205 appears inapplicable. Federal Personnel Manual Letter No. 551-1, Attachment 2 does not define the 1811 job series as a professional occupation. Thus, the professional exemption does not appear to apply. The foreign exemption does not appear to apply as is it is highly unlikely that SA Noone was permanently stationed outside the United States and its territories.

Based on the foregoing and based on the little we know about (SA) Noone's employment at NCIS due to a lack of records,[3] we conclude that SA Noone should most likely have been treated as nonexempt during the applicable time period.

Based on careful review of the record, we concur with the agency's determination. The claimant is requesting compensation for work performed from August 2, 1985, to January 3, 1987, when he was employed by Navy, less his active duty military service time.[4] Therefore, Navy would have been required to compensate the claimant under the overtime pay provisions of Subpart E of Part 551 of 5 CFR for work he performed within the claim period for Navy; i.e., within five years prior to the commencement of the Gulf War on August 2, 1990, and subject to deduction for any monies paid under the claimant's DOJ settlement agreement. In this case, the entire claim period (August 2, 1985, to January 3, 1987) is covered.

The claimant's Standard Form (SF) 50s documenting his employment with Navy indicate he was an exempt employee during the claim period, i.e., August 2, 1985, to January 3, 1987.

**Decision**

The claimant's work is FLSA nonexempt (i.e., covered by FLSA overtime provisions), and he is entitled to compensation for all overtime hours worked at the FLSA overtime rate for the period of the claim he worked for Navy, i.e., August 2, 1985, to January 3, 1987. Since both his military service time and his previous FLSA settlement occurred subsequent to January 3, 1987, they are not germane to the overtime pay calculations for the period of the claim covered by this decision. The agency must follow the compliance requirements on page ii of this decision.

The claimant must submit evidence showing the amount and extent of overtime that was performed as provided for in 5 CFR 551.706(a) as informed by the agency payroll records submitted to OPM and the claimant on September 16, 2016. The agency will have the opportunity to review this evidence using any other sources of information available, including witnesses, before a determination is made as to whether the claimant is entitled to any back pay under the FLSA and any interest as required under 5 CFR part 550, subpart H.[5] Any petition for

---

[3] The claimant's official personnel folder was located after receipt of the agency's letter. His employment record was shared with the agency, which subsequently reported that its conclusion remains unchanged.

[4] The claimant's Certificate of Release or Discharge from Active Duty, DD Form 214, included with his claim shows he was in an active duty status from March 11, 1991, to June 14, 1991.

[5] The agency's overtime and interest calculations must account for the claimant's prior receipt of administratively uncontrollable overtime, documented as 25 percent on his SF-50s covering the claim period, using the principles contained within 29 U.S.C. 207(k), 5 CFR 551.501(a)(1) and

OPM decision number F-1811-12-06                                    4

attorney's fees and expenses must be submitted to the agency out of which this claim arose. Should the claimant be determined to be entitled to back pay which the claimant believes to be incorrectly computed, the claimant may file a new FLSA claim with this office.

<hr>

(5), and 5 CFR 551.541(a).  OPM's Fact Sheet on the topic can be found at https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/guidance-on-applying-flsa-overtime-provisions-to-law-enforcement-employees-receiving-administratively-uncontrollable-overtime-pay/

OPM decision number F-1811-12-06                                                    5

## Distribution

Mr. Jules Bernstein and Ms. Linda Lipsett
Law Offices
Bernstein & Lipsett, P.C.
1130 Connecticut Avenue, NW
Suite 950
Washington, DC  20036-1798

Mr. Joseph C. Noone
9829 Tunica Trace
St. Francisville, LA  70775

Ms. Kathryn Good
Kathryn.good@ncis.navy.mil

Mr. David P. Pedersen
David.p.pedersen@navy.mil

Ms. Stacey Cruz
Stacey.cruz@ncis.navy.mil

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February, 2019, a copy of the foregoing was filed electronically.  I understand that notice of this  filing will be sent to all parties by operation of the Court's electronic filing system. Parties may   access this filing through the Court's system.

<u>s/Linda Lipsett</u>