1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    JOHN A. SHEA,                      )

4            Plaintiff,                 )

5        vs.                            )  Case No. 16-793C

6    UNITED STATES OF AMERICA,          )

7            Defendant.                 )

8    --------------------------------)

9

10                       Courtroom 4

11          Howard T. Markey National Courts Building

12                  717 Madison Place, N.W.

13                     Washington, D.C.

14                 Wednesday, March 20, 2019

15                       10:00 a.m.

16            Trial Volume 3 - Closing Argument

17

18          BEFORE:  THE HONORABLE CHARLES F. LETTOW

19

20

21

22

23

24

25   Jen Razzino, CER, Digital Reporter

520

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFF:
 3            DANIEL M. ROSENTHAL, ESQ.
 4            LINDA LIPSETT, ESQ.
 5            Bernstein & Lipsett, P.C.
 6            1130 Connecticut Avenue, N.W., Suite 950
 7            Washington, D.C.  20036
 8            (202) 296-1798
 9            chouse@bernsteinlipsett.com
10            NARI E. ELY, ESQ.
11            James & Hoffman, P.C.
12            1130 Connecticut Avenue, N.W., Suite 950
13            Washington, D.C.  20036-3975
14            (202) 496-0500
15            neely@jamhoff.com
16
17    ON BEHALF OF THE DEFENDANT:
18            DAVID M. KERR, ESQ.
19            MARIANA ACEVEDO, ESQ.
20            U.S. Department of Justice
21            Commercial Litigation - Civil Division
22            P.O. Box 480, Ben Franklin Station
23            Washington, D.C.  20044
24            (202) 307-3390
25            david.m.kerr@usdoj.gov
```

521

Trial - Closing Argument

John A. Shea v. USA                                                    3/20/2019

```
 1   APPEARANCES (CONT.)

 2

 3   ON BEHALF OF THE DEFENDANT:

 4           S. CHRISTOPHER MULLINS, JR., ESQ.

 5           Assistant Counsel, Civilian Personnel Law

 6           27130 Telegraph Road, Room W3538

 7           Quantico, Virginia  22134-2253

 8           (571) 305-9096

 9           stephen.mullins@navy.mil

10

11   ALSO PRESENT:

12           John Shea, Plaintiff

13           Jessie Beyderman, Paralegal

14

15

16

17

18

19

20

21

22

23

24

25
```

522

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1                          I N D E X

2

3       CLOSING ARGUMENT                          PAGE

4         MR. ROSENTHAL                       524, 568

5         MR. KERR                            556, 572

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Trial - Closing Argument

John A. Shea v. USA                                            3/20/2019

```
 1                    P R O C E E D I N G S
 2                    -    -    -    -    -
 3           (Proceeding called to order, 10:01 a.m.)
 4           THE COURT:  Please be seated.
 5           Good morning.
 6           ALL COUNSEL:  Good morning, Your Honor.
 7           THE COURT:  The case before the Court this
 8   morning is Shea versus United States, Number 16-793.
 9           Ms. Lipsett, you are there.
10           MS. LIPSETT:  Yes, I am.
11           THE COURT:  Would you please introduce yourself
12   for the record as counsel for the Plaintiff.
13           MS. LIPSETT:  Yes.  Linda Lipsett, counsel for
14   the Plaintiffs, and accompanied by my colleagues Daniel
15   Rosenthal, Nari Ely, and Jessie Beyderman.
16           THE COURT:  All right, thank you.
17           And is that Mr. Shea, do I remember that
18   correctly?
19           MR. SHEA:  Yes.
20           THE COURT:  All right, thank you.
21           Mr. Kerr, would you please introduce yourself for
22   the record and your colleagues.
23           MR. KERR:  Good morning.  Thank you.
24           I'm David Kerr for the Department of Justice
25   representing the United States in this matter.  With me
```

Trial - Closing Argument
John A. Shea v. USA                                          3/20/2019

```
 1    at counsel table is Chris Mullins from NCIS and Mariana
 2    Acevedo, also from DOJ.
 3              THE COURT:  All right, thank you.  Welcome.
 4              We do have essentially the post-trial closing
 5    argument.  Ms. Lipsett?
 6              MS. LIPSETT:  Mr. Rosenthal will make that
 7    presentation.
 8              THE COURT:  Thank you.
 9              Mr. Rosenthal, you may proceed.
10              MR. ROSENTHAL:  Thank you, Your Honor.
11              I do have just a few slides I was going to use
12    over the course of the presentation if that's okay with
13    the Court.
14              THE COURT:  Yes.
15              MR. ROSENTHAL:  And it probably will be a little
16    while before I -- a few minutes before I get there.
17              My main goal this morning -- my primary goal is
18    to answer any questions that the Court has about the
19    briefs, which I think have thoroughly captured the
20    issues before the Court, but I'm going to give a summary
21    of our view on the issues, starting with the first
22    issue, the liability issue, whether Mr. Shea is exempt
23    from the FLSA or nonexempt.
24              So this is an issue on which the Government bears
25    the burden of proof, and they have the burden to
```

Trial - Closing Argument

John A. Shea v. USA                                                3/20/2019

1    eliminate any reasonable doubt as to whether Mr. Shea is
2    exempt.  The way we look at Mr. Shea's work, it
3    basically breaks down into two main components.  There's
4    his surveillance work, the basic work of sitting outside
5    of someone's home, tracking them as they move, remaining
6    discreet; and then there's the work that he performs
7    when he's the team lead.  I think both parties have
8    largely looked at those -- the two main components of
9    Mr. Shea's work.
10            As to that first component, the surveillance
11   work, we think that that work is pretty clearly not
12   exempt administrative work, and this involves, as I
13   said, staking out someone's home, following them in a
14   car, watching them with a binocular or a monocular,
15   taking photos of them, and remaining discreet.  We don't
16   think that that really has any connection to management
17   or general business operations of an administrative
18   worker, which, you know, are things that involve the
19   internal kind of workings or runnings of a business.
20            So -- and we think that that's what the Court
21   thought, at least at the summary judgment stage when it
22   looked at the record at that point and thought that
23   Mr. Shea's work as a line investigative specialist was
24   nonexempt.  The trial record confirms that conclusion,
25   we think.

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

1          So that takes us to -- it basically means that
2     the exemption question is whether his team lead work
3     makes him an exempt employee, and there are two main
4     reasons why the answer to that question is no.  The
5     first one is that Mr. Shea is not a full-time team lead.
6     He's a full-time team member who sometimes serves as
7     team lead.
8          And, in fact, after we heard all the evidence at
9     the trial, including Mr. Freeman's list that he put
10    together, his testimony about that list, and the
11    testimony from Mr. Shea and Ms. Sevigny, it -- all that
12    evidence put together shows that Mr. Shea was team lead
13    on somewhere between one-fifth and one-quarter of the
14    team's missions.  We put those figures forth in our
15    post-hearing -- post-trial brief, and they weren't
16    disputed by the Government in their response.
17         So just to --
18         THE COURT:  Well, the Court had the impression
19    from Mr. Freeman's testimony that Mr. Shea was chosen as
20    team lead for situations that were likely to last a
21    while or were quite important to the case officers and
22    so on and so forth.  Does that make a difference?
23    Because the 50 percent test doesn't have to be met
24    necessarily --
25         MR. ROSENTHAL:  Sure, sure.

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

 1          THE COURT:   -- depending on the other
 2   circumstances that surround somebody's responsible
 3   position.
 4          MR. ROSENTHAL:  Yes, Your Honor.  That's correct.
 5          So the 50 percent, I have a little more to say
 6   about the -- kind of what the percent is, but once we --
 7   once we look at that, we'll look at the OPM regulation,
 8   which says that if someone spent more than 50 percent of
 9   their time on exempt duties, typically they will be
10   exempt.  If they spend less than 50 percent of their
11   time on their duties, then there are some specific
12   showings that the Government has to make in order to
13   show that that is the person's primary duty.
14          So one of those factors -- one of those three
15   factors does relate to time.  The time doesn't
16   completely disappear from the analysis, because if
17   someone only spends, you know, an occasional amount of
18   their time on something, the law says that that is a
19   factor and that -- and as we said in our briefs, we
20   haven't found any case where any court has said that
21   someone with this percentage of time, as I'll show in
22   the next few slides, that that was a primary duty.  The
23   Government hasn't cited a single case of that.  So time
24   is -- always is a factor.
25          But then the second factor in that OPM test is

Trial - Closing Argument

John A. Shea v. USA                                           3/20/2019

1    whether that duty is the reason for the existence of the

2    position, which I take to essentially be saying this

3    duty is, you know, clearly the most important of the

4    person's duties, so important that it's really why there

5    is this position, so that someone could fulfill this

6    duty.

7              THE COURT:  Well, there was a ladder of

8    progression that people testified about with these

9    particular specialists.

10             MR. ROSENTHAL:  Correct.

11             THE COURT:  Starting with a GS-7 and rising to a

12   GS-12, and Mr. Shea is definitely at GS-12, along with

13   Ms. Sevigny and -- and I can't remember the third

14   person's name.

15             MR. ROSENTHAL:  The one who testified up here?

16             THE COURT:  Yes.

17             MR. ROSENTHAL:  Mr. Ester.  Actually, all of the

18   investigations specialists currently, I believe, are

19   GS-12s.

20             THE COURT:  All of them?

21             MR. ROSENTHAL:  And the record shows that many

22   GS-12s never serve as team lead --

23             THE COURT:  Ah-ha.

24             MR. ROSENTHAL:  -- including -- I think the --

25             THE COURT:  Does the record actually show that

Trial - Closing Argument

John A. Shea v. USA                                                3/20/2019

1     all of them are GS-12s at this point?

2              MR. ROSENTHAL:  I believe so.  I will have to

3     check that.  I think there are younger members on the

4     team, such as Mr. Ester and others, who have now climbed

5     the ladder, so to speak, and they are at the GS-12

6     level.  But the record is certainly clear, as we said in

7     our brief, that there have been several GS-12s who have

8     never served as team lead.  So it's not something that's

9     actually required of the GS-12 position.  It's something

10    that some GS-12s do.

11             So we think that that strongly suggests that

12    that's not "the reason for the existence of the

13    position."  And the Government hasn't produced any

14    evidence to say what the reason for the existence of the

15    position is.  They didn't, for example, produce anyone

16    from HR who could talk about why this position exists

17    and why it was created.

18             THE COURT:  Let me ask a question about the

19    description of the responsibilities of Mr. Shea.  Has

20    that actually been modified?  There have been

21    suggestions that it would be.  There was a little bit of

22    a motion practice about that.  Where does that stand?

23             MR. ROSENTHAL:  As far as we know, the position

24    description hasn't been updated yet.

25             THE COURT:  There was a draft, and you asked for

Trial - Closing Argument

John A. Shea v. USA                                              3/20/2019

1     the draft.  Is that correct?

2               MR. ROSENTHAL:  Correct.  So we -- we received --

3     we asked for that and we received from the Government

4     essentially several pages that were fully redacted, and

5     they said that it was on the basis of work product or

6     privilege.  It seems like now they're focusing on work

7     product as the ground.  We think that that doesn't work

8     for several reasons.

9               One is that there's really no contention on their

10    side, I don't think, that it reflects the mental

11    impressions of an attorney.  So, at most, it would be

12    kind of the lower category of protection, of work

13    product, which means that we'd still have the ability to

14    have -- to be entitled to that if it was evidence that

15    was important and that we couldn't get through other

16    means.

17              And then -- but even in that lower category, we

18    don't think it fits there because, as we cited several

19    cases in our briefs, there's a test that requires a

20    certain expectation of confidentiality, that this is

21    something internal and confidential within the Defendant

22    or the party, but in this case a position description is

23    something that's disseminated widely to, you know, the

24    people in the position and others.  They are not

25    confidential documents.

Trial - Closing Argument

John A. Shea v. USA                                      3/20/2019

```
 1          Moreover, the Government said that it was
 2  supposedly preparing this to be released after the
 3  conclusion of litigation, not for use in the litigation,
 4  but after the conclusion of litigation, they would
 5  disseminate this publicly, for the public.
 6          THE COURT:  Let me ask a question about
 7  comparability.  Do you have the updated position
 8  descriptions for the other surveillance team?
 9          MR. ROSENTHAL:  No.
10          THE COURT:  You do not.  So you can't make a
11  comparative analysis.
12          MR. ROSENTHAL:  No.  We --
13          THE COURT:  We do know that the position
14  descriptions have been revised recently, though.  Is
15  that correct?
16          MR. ROSENTHAL:  The classification has been
17  changed.
18          THE COURT:  The classification has been changed,
19  but that's not the question.
20          MR. ROSENTHAL:  I don't know that -- right.  I
21  don't -- I am not aware of any revised position
22  description for any member of the team that hasn't been
23  produced to us.  One reason we think that's important is
24  because even after we sat through two days of trial and
25  heard a lot of detailed testimony about what Mr. Shea
```

Trial - Closing Argument

John A. Shea v. USA                                           3/20/2019

1    does, the Government is still, throughout its brief,

2    relying on the language of the position description to

3    define his duties at some portions of their argument,

4    and --

5            THE COURT:  Well, but that's understandable given

6    the particular test, especially for the reasonable basis

7    and good faith issue in the case.

8            MR. ROSENTHAL:  I think -- I think you're right,

9    it could have more applicability on that prong of it,

10   that's fair, to the extent it reflects something about

11   what the agency thought about what his duties were.

12           THE COURT:  Exactly.

13           MR. ROSENTHAL:  So -- but in terms of the

14   liability question, that's simply based on what he

15   actually does in his job.  But my main point there is

16   that since the Government is relying on -- in part on

17   the position description, including for the good faith

18   issue, we believe that we're entitled to know whether

19   there's been an internal acknowledgment that certain

20   parts of that position description are not accurate, and

21   that may be reflected in a revised position description.

22           THE COURT:  Well, we had testimony on that

23   subject, though, from Mr. Shea and Mr. Freeman.  Is that

24   correct?

25           MR. ROSENTHAL:  Ah, well, Mr. Shea and

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

```
 1    Mr. Freeman talked about their -- they both acknowledged
 2    parts of the position description that are not, in fact,
 3    accurate, that's true.  But in terms of whether that's
 4    been -- sort of gone up the chain within HR and NCIS, we
 5    don't know that.
 6          THE COURT:  Well, there was discussion between
 7    Mr. Shea and Mr. Freeman -- and, actually, I don't know
 8    whether there was testimony, I don't recall -- regarding
 9    the supervisor after Mr. Freeman left, but in any event,
10    that discussion between the two of them related to
11    overtime pay, if the Court has it correctly.
12          MR. ROSENTHAL:  So Mr. Shea and Mr. Freeman, yes,
13    both -- they -- Mr. Shea brought to Mr. Freeman a
14    concern about overtime pay for the team, and Mr. Freeman
15    relayed that concern to his supervisor, the assistant
16    special agent in charge, and also to an HR-type person.
17          THE COURT:  And that had to do -- just let me
18    clarify in my own mind what I think that was all about.
19    I think that had to do with -- I've always forgotten the
20    acronym, OU -- whatever it is --
21          MR. ROSENTHAL:  AUO and RSO.
22          THE COURT:  -- AUO and -- all right, whether or
23    not you got a certain amount of overtime pay in addition
24    to AUO if you exceeded a certain number of hours.  Does
25    the Court understand that?
```

1          MR. ROSENTHAL:  Yes.  That's basically right.
2    And Mr. Shea, he wasn't an expert on the pay system.  He
3    didn't necessarily know all the terms, but what he knew
4    is that he was working a lot of hours, and he was only
5    getting this 25 percent AUO premium even though he was
6    working a lot more than 25 percent extra hours.  So that
7    was essentially the concern he brought in.
8          And because he didn't know about the FLSA
9    specifically, he raised that -- referenced something
10   called "regularly scheduled overtime," which is a
11   different -- a different type of overtime that someone
12   can get in addition to AUO.  But clearly both Mr. Shea
13   and Mr. Freeman thought that the team should be getting
14   more overtime pay, and they relayed that up the chain,
15   and as far as we know, NCIS took no action based on
16   that.
17         So returning to the primary duty issue, let me
18   just make a couple more comments about that, and then
19   I'll move on to the next issue.  So we do have a
20   visual -- a visual depiction of -- this is the -- what
21   the record shows about how often Mr. Shea served as team
22   lead, about 19 percent of the missions, which is the
23   smaller --
24         THE COURT:  Now, there was a time in 2015, if the
25   Court recalls correctly, when Mr. Shea served

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1      considerably more time.  Now, you -- I was going to say

2      quibble, and that's not exactly the term -- but there's

3      a little bit of a controversy over the number of hours

4      that he served as team lead compared to the total number

5      of hours he worked in 2015.

6              MR. ROSENTHAL:  Correct.

7              THE COURT:  Not so much in '16 and '17 and so on.

8              MR. ROSENTHAL:  Correct.  So, yes, let me get to

9      that.  So there are several different ways of looking at

10     it.  So this one is based on number of missions.  We

11     have also done it based on number of days.  So this

12     shows that Mr. Shea -- 22 percent of the days when the

13     team was on a mission, he was -- he was team lead, but

14     then the Government provided a method that was based on

15     hours, so I'm going to talk about that now.

16             So -- actually, before I even get to this chart,

17     let me make a few other comments about the Government's

18     method.  So what the Government basically did is they

19     looked at all the hours where Mr. Shea was on a mission

20     where he was team lead for that mission, so they added

21     up all those hours.  Then they added up a certain number

22     of hours before and after each mission when he was team

23     lead and added those up.  And so that sum goes on the

24     top of the fraction.

25             And then on the bottom of the fraction, they put

Trial - Closing Argument
John A. Shea v. USA                                    3/20/2019

1    the total number of hours that he worked in the entire
2    year, paid hours minus leave, except they got that
3    wrong.  They miscounted the number of hours that he
4    worked over the course of the year.  So you can see
5    that -- I don't know if you have the exhibits in front
6    of you, but if you look at Plaintiff's Exhibit 4, it is
7    the spreadsheet -- or 3 -- I'm sorry, I've got my tabs
8    mixed up.  It's either 3 or 4.  Oh, it's Plaintiff's
9    Exhibit 4, I'm sorry.
10          You can look at the rows that show his hours
11   and --
12          THE COURT:  Well, there was a difference of five
13   or six hundred hours, at least you briefed that.
14          MR. ROSENTHAL:  Right.
15          THE COURT:  Is that correct?
16          MR. ROSENTHAL:  Yes.  So if you add these up
17   correctly, that fraction is about 37 percent.  The
18   problem is, though, that at the top of that fraction,
19   they are, first of all, counting these pre- and
20   post-mission hours that are nowhere in the record
21   supported whatsoever.  There's no evidence that he spent
22   40 hours before a mission doing team lead duties.  In
23   fact, the only time estimate we got was Mr. Shea saying
24   it took him about ten minutes to put together a plan,
25   which is largely copied from something the case agent

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    had filled out and then from past plans.  It's kind of a
2    boilerplate.
3           So if you take all those hours out -- and we
4    didn't put this in our brief, but you can calculate it
5    from the charts -- it falls to 28 percent, and then --
6           THE COURT:  Well, except that part of the
7    responsibility of the team lead is to organize the team,
8    the assistant team lead, and so on and so forth, but
9    especially to meet with the case manager or the case
10   agent, depending on --
11          MR. ROSENTHAL:  Correct, yes.
12          THE COURT:  -- and to sort out what's actually
13   happening.  That would appear to be the critical element
14   of the entire exercise.
15          MR. ROSENTHAL:  Yes, Your Honor.  I agree with
16   that, but there's -- the Government didn't produce any
17   evidence of how long that takes, and --
18          THE COURT:  Well, that's true, but on the other
19   hand...
20          MR. ROSENTHAL:  Well, I think we could certainly
21   all agree that it probably takes at least an hour, but
22   does it take 40 hours?  That's what the Government
23   assumed.  That's the question, so...
24          And plus, another thing to keep in mind here is a
25   lot of these missions are repeat missions.  So it's a

538
Trial - Closing Argument
John A. Shea v. USA                                3/20/2019

1   single case where they are going out to conduct
2   surveillance multiple times on the same target.  So in
3   those cases, the need for -- I would imagine the need
4   for a lot of pre-mission discussion is diminished
5   because they've already been out watching this target
6   and they have already been briefed on the case.
7           THE COURT:  Well, in fact, Mr. Shea had a number
8   of those situations.
9           MR. ROSENTHAL:  Yes.
10          THE COURT:  The word "Mohave" sticks in my mind
11  for a whole variety of reasons, but in any event...
12          MR. ROSENTHAL:  Yes.  So in any event, we
13  think -- and I just -- a theme that I may return to is
14  that this is the Government's burden of proof on this
15  prong.  So to the extent there's a question where
16  there's no evidence, such as how long does Shea meet
17  with the case agent, I think the Court should bear in
18  mind that it was really -- that the burden was on the
19  Government to produce that evidence.
20          So if you imagine this fraction, kind of doing
21  the math correctly and taking out those -- at least some
22  of those pre- and post-mission hours, then you get to
23  the question of those hours when Mr. Shea was on a
24  mission and he was the team lead.  Are we going to count
25  all of those hours towards his team lead work or are we

Trial - Closing Argument

John A. Shea v. USA                                        3/20/2019

1    only going to count some of them?

2           The Government says you count all of them, but

3    the testimony is not disputed that a lot of that time,

4    Mr. Shea is doing the basic surveillance work.  He's,

5    you know, using his camera or using his monocular or

6    he's following someone or he's simply trying to remain

7    discreet.  And, in fact, it's undisputed that about 90

8    percent of his time is on those sorts of things.

9           So this is a -- this chart is kind of a visual

10   depiction of that.  The large blue area, the 71.9

11   percent, that's the percentage of hours that have no

12   connection whatsoever to team lead work unless you are

13   going to attribute some of these pre- and post-mission

14   hours.

15          And then the two smaller slices of the pie are

16   hours on a mission in which he was the team lead.  The

17   Government attributes the entirety of both of those

18   slices to the team lead role.  We attribute just 10

19   percent based on the undisputed testimony of Mr. Shea

20   and Ms. Sevigny, so that's the small slice.

21          But the real reason that I wanted to show this is

22   because of what it looks like for 2016 and '17.  So in

23   2016, those two small slices which the Government says

24   are all attributable to the team lead role are really

25   only 10 or 11 percent, and the portion that's truly

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    attributable to the team lead role is just 1 percent in

2    our view.

3           And then in 2017, it's even more stark.  So all

4    the hours attributable to missions on which Mr. Shea is

5    team lead are only about 7 percent, and then we would

6    say the team lead portion is just that tiny little

7    sliver of 0.7 percent.  So that 0.7 percent, in our

8    view, in 2017, is the only time that the record actually

9    shows Mr. Shea spent on team lead duties in that year.

10          But there's -- we have another argument which is

11   equally important in our view, which is that even if

12   Mr. Shea spent all of his time as team lead, he still

13   wouldn't be an exempt administrative employee, and we

14   say that based on a line of cases and regulations which

15   say that when an employee is out doing field work in an

16   area related to investigations, surveillance, or other

17   things, such as firefighting or EMS, the fact that that

18   person is sort of a supervisor directing people doesn't

19   make them an exempt employee.

20          And there is a Department of Labor regulation

21   which is -- we think is quite clear on this point, which

22   we have cited, which says someone who performs

23   surveillance, even if they're directing other employees

24   in the field, they're not an exempt administrator.

25          THE COURT:  Now, that's the first responder

541
Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    regulation, or at least it's popularly known as that.
2    Is that correct?
3                MR. ROSENTHAL:  Correct.
4                THE COURT:  And Mr. Shea actually does not have
5    law enforcement responsibilities or powers.  He can't
6    make an arrest.
7                MR. ROSENTHAL:  Well, that's true.  Yes.
8                THE COURT:  We had testimony on that subject,
9    right?
10               MR. ROSENTHAL:  Yes.
11               THE COURT:  Does that make a difference?  Does
12   it -- he's really not a first responder at all.  He's
13   somebody -- and, indeed, he indicated most of his work
14   deals with national security surveillance rather than
15   criminal surveillance.
16               MR. ROSENTHAL:  That's correct, Your Honor.  The
17   term "first responder" --
18               THE COURT:  Does that make a difference?
19               MR. ROSENTHAL:  We don't -- we don't think so.
20   The term "first responder" doesn't appear anywhere in
21   that regulation.
22               THE COURT:  It does not.
23               MR. ROSENTHAL:  It does not.  That is a label
24   some people have used because many of the duties within
25   the regulation are first response type duties, but the

Trial - Closing Argument
John A. Shea v. USA                                          3/20/2019

1   regulation does not use that term, and it lists a number
2   of duties that are not traditional first response duties
3   within that, including, explicitly, performing
4   surveillance.  That's one of the duties that's listed.
5       So the simple text of the regulation we think
6   says that whether or not it's a first responder doesn't
7   really matter, but the thing that makes an employee in
8   that type of position exempt, despite the first
9   responder regulation, is when the employee does sort of
10  managerial or supervisory things outside the field that
11  are not related to the particular missions.
12      THE COURT:  Now, that goes to the position
13  description.  Is that correct?
14      MR. ROSENTHAL:  Ah, well, I suppose there
15  might -- there may be some phrases in the position
16  description that arguably fall in that category, but
17  there's -- such as there's one in there about, you know,
18  preparing reports, about analyses of the team, something
19  like that, but they haven't showed that Mr. Shea doesn't
20  do that.
21      And moreover, there's no time percentage
22  associated with that in the position description,
23  which -- and I am going to get to this in a moment, but
24  it's -- basically, as Ms. Cruz herself admitted, in
25  order to use something like that, to deem someone

Trial - Closing Argument

1    exempt, you really need to know how much time they spend
2    on it.  If it's something they do once a year for a
3    couple hours, that's not going to cut it.  So NCIS
4    actually knows, because Ms. Cruz told us, that you need
5    that type of information to assess a position, and it's
6    not -- it's not there in the position description.
7         But I just do want to mention, so that we're
8    clear, we're not saying that anyone who does any
9    surveillance is -- is nonexempt.  The question, again,
10   is whether they have managerial or supervisory duties
11   that are not connected with their field work, and the
12   Benavides case is a perfect example of that.
13        THE COURT:  Well, Mr. Freeman went out on a
14   couple of missions himself.
15        MR. ROSENTHAL:  Mr. Freeman would be a perfect
16   example of that.  So Mr. Freeman is the type of employee
17   who, although he did do some field work -- and, in fact,
18   the current supervisor, Mr. Cooper, does even more than
19   Mr. Freeman, he's almost always in the field, was the
20   testimony -- but those roles do involve other duties
21   outside the field that are supervisory, which may
22   involve performance evaluations, hiring, those sort of
23   things.
24        So in our view, because there's no evidence that
25   Mr. Shea does anything like that, even if he was always

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

 1    team lead, he would not be an exempt employee, and we
 2    have -- I think it's almost like the litany of cases
 3    that we've cited in almost every one of our submissions
 4    that I won't go through again, but they are basically
 5    all cases where people had essentially team lead type
 6    jobs, they were directing others in the field, and, in
 7    fact, in the Morrison case, they were station and shift
 8    commanders who were kind of the fourth level up within
 9    the hierarchy.  They had three whole kind of layers of
10    employees below them, and they were found nonexempt
11    because all of their -- at least the vast majority of
12    their more managerial type duties were all done in the
13    field in the course of, you know, nonexempt work.
14          So that's essentially what I have to say --
15          THE COURT:  Is the Morrison case the fire
16    captains or the police sergeants?
17          MR. ROSENTHAL:  There is -- Mullins is the police
18    sergeants --
19          THE COURT:  Mullins, I'm sorry.  That's what I
20    was thinking of.
21          MR. ROSENTHAL:  Yes.
22          THE COURT:  All right, thank you.
23          MR. ROSENTHAL:  So that's essentially our case on
24    the liability issue, and if the Court has no other
25    questions on that, I will move on to the --

Trial - Closing Argument
John A. Shea v. USA                                          3/20/2019

1          THE COURT:  No.  I'm sorry I asked so many
2     questions, but go ahead.
3          MR. ROSENTHAL:  I appreciate knowing what Your
4     Honor is interested in hearing about so I don't just say
5     things you're not interested in hearing about.
6          So let's talk about the liquidated damages issue.
7     So this is another issue on which the Government has the
8     burden of proof, and the cases say that this is "a
9     difficult burden" and that it's really the unusual case
10    in which, under the FLSA, in which only single damages
11    are awarded.  The kind of typical case is double
12    damages.
13         In order to avoid that result, there are two
14    prongs the Government has to show.  There's the good
15    faith prong and the reasonable grounds prong.  Those are
16    analyzed separately.  One of them is essentially a
17    subjective test and one of them is an objective test.
18         So the good faith prong, which is the subjective
19    component, is based on whether the employer took "active
20    steps" to ascertain the dictates of the FLSA and act to
21    comply with them, and the Government had the burden to
22    show that they did that.
23         So in their brief, they attempt to do that by --
24    there's only one thing that they are able to point to as
25    a step they took, which is that the supervisor

Trial - Closing Argument

1    supposedly did an annual review of the position

2    description, which I think you've alluded to a couple

3    times.  So we think that that -- there are two reasons

4    why that doesn't get them over -- over their burden.

5           The first is that that review of the position

6    description, it may be a review of the -- what the

7    employee does, but it's not a review of whether the

8    agency is complying with the FLSA.  Those are two

9    separate issues.  And we know that those are separate

10   because Ms. Cruz testified to that.  This is testimony

11   from Ms. Cruz.  We asked her (as read):

12          "QUESTION:  That annual review process is not a

13   process to review whether the FLSA classification is

14   correct.

15          "ANSWER:  Correct.

16          "QUESTION:  It's just to review the accuracy of

17   the position description.

18          "ANSWER:  The supervisor is not asked to review

19   the FLSA classification."

20          THE COURT:  Well, the supervisor probably is not

21   expert in the FLSA classification anyway.  HR would be.

22          MR. ROSENTHAL:  Correct.

23          THE COURT:  That's why Ms. Cruz testified.

24          MR. ROSENTHAL:  Absolutely.  And if you look at

25   the Abbey case, which we cited, that was a case where

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    the Court of Claims found a lack of good faith and

2    reasonable grounds because the person who was

3    responsible for doing a check was not trained in the

4    FLSA, did not consult anyone who was an expert on the

5    FLSA.  So it's really not possible for anything the

6    supervisor may have done to satisfy NCIS's obligation to

7    check its compliance.

8         THE COURT:  Well, except that the position

9    description -- which if the Court recalls correctly was

10   adopted in 2007, along with the classification, or

11   roughly contemporaneously, at least -- was still in

12   place.  That's part of the problem in this case.

13        MR. ROSENTHAL:  Well, that's -- that's absolutely

14   true, Your Honor, which brings me to another key point,

15   which is that under a number of cases which we have

16   cited, it's not enough to say we've had this policy in

17   place for a long time, and, you know, it hasn't been

18   challenged, so, therefore, we're entitled to rely on it.

19   Courts have rejected that.

20        It's not okay for an employer to simply say, you

21   know, since we've had this policy for a while, we're

22   going to continue relying on it, and that's especially

23   true -- especially true -- when the employer doesn't

24   actually know really any information about how or why

25   that original classification was made.  This is the

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    second excerpt from Ms. Cruz's testimony that I wanted
2    to draw the Court's attention to.
3         Ms. Cruz testified that she does not know which
4    exemption was used.  That's the first two questions
5    there.  She doesn't know if it was the administrative
6    exemption, for example.  She does not know what
7    reasoning NCIS went through, and that's the question
8    that begins on line 20.  She does not know what process
9    they went through.
10        And then on the top of the next page, they do not
11   know -- she does not know if they even considered
12   regulations in making that determination.  So we have no
13   evidence that would allow the Court to conclude that
14   that original classification was done in compliance with
15   the FLSA, and we have no evidence to allow the Court to
16   conclude that at any time after that original
17   classification, NCIS ever, you know, took a look at that
18   or even thought about it, other than this supposed
19   annual review of the position description.
20        The other problem with that annual review, by the
21   way, is that Mr. Freeman said on cross examination that
22   he didn't do it; he wasn't involved in it.  So his
23   testimony is unclear at best as to whether this process
24   took place at all.  And Ms. Cruz did -- just to
25   re-affirm a point I made earlier, Ms. Cruz did testify

Trial - Closing Argument

1    directly that, as far as she knows, there was no

2    re-assessment of the classification from 2007 up until

3    we filed the lawsuit.

4           So what all of this amounts to, basically, is a

5    conspicuous absence of evidence of any efforts that NCIS

6    took to check whether it was actually compliant with the

7    FLSA with respect to this position, but that absence of

8    evidence is then compounded by a presence of a lot of

9    evidence that NCIS actually wasn't applying the FLSA

10   correctly, and that starts with violations of the FLSA

11   that were shown at the trial.

12          So Mr. Ester testified that as an entry-level

13   GS-7 investigations specialist, he was classified as

14   exempt from the FLSA.  He was, you know, still shadowing

15   other employees.  He was making forty-some thousand

16   dollars a year at that time.  And Ms. Cruz told us on

17   the stand that that was -- that it wouldn't be proper to

18   categorize a GS-7 investigations specialist as exempt.

19          So one thing that we know for sure from this

20   record is that at at least one point in the past, NCIS

21   did admittedly misclassify one of the investigations

22   specialists.  We don't know how widespread that was, you

23   know, we might surmise that probably that wasn't

24   specific to Mr. Ester, but we don't know for sure.

25          Then Mr. Ester testified that at some point he

Trial - Closing Argument

1    was changed to nonexempt, but even at that time he

2    wasn't actually paid like a nonexempt employee.  He only

3    continued getting that AUO premium, not the extra

4    overtime.  So that's clear in the record.

5         And then on top of that, we put, in an appendix

6    to our brief, some public documents from OPM of which

7    the Court may take judicial notice, which show that OPM

8    found other violations of the FLSA committed by NCIS,

9    and those were criminal investigators.  Ms. Cruz told us

10   on the stand that she wasn't really familiar with those

11   cases, which was somewhat surprising since she's the

12   head of classification, but the Court can take judicial

13   notice of them because they're government public

14   documents.  So those -- and those were three different

15   cases.  So that amounts to some significant evidence

16   that NCIS was actually admittedly violating the FLSA.

17        And then we had Ms. Cruz's attempts to try to

18   explain NCIS's processes for FLSA classification, and

19   those also show that NCIS was not reasonably

20   implementing the FLSA.  So the first portion of

21   Ms. Cruz's testimony that I wanted to point to was --

22   so, she testified -- Ms. Cruz testified on the first day

23   of the trial and the second, because her testimony was

24   interrupted, and this was some of her testimony from the

25   first day of the trial, in which she said that

Trial - Closing Argument

John A. Shea v. USA                                      3/20/2019

1    Mr. Shea's performance of production work tied to
2    criminal investigations supported the decision to
3    classify him as exempt, she agreed with that, and she
4    re-affirmed it when asked if she was -- if she was sort
5    of sticking with that testimony.
6           But then the next day I basically posed the same
7    question to her (as read):
8           "QUESTION:  Do you believe that if an employee
9    performs work directly related to criminal and
10   counterintelligence investigations, that production
11   function at NCIS, that would support finding that
12   employee exempt?
13          "ANSWER:  No."
14          And she -- I asked her:
15          "QUESTION:  Do you remember that during the
16   deposition, you actually said that did support finding
17   Mr. Shea exempt?"
18          She agreed.
19          And I asked her:
20          "QUESTION:  So you understand that was not a
21   correct statement."
22          And she agreed.
23          So we have the head of classification of this
24   agency who appears to be confused about a pretty basic
25   principle of how the FLSA works.  She further,

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

1   similarly, testified -- we asked her (as read):

2           "QUESTION:  Do you believe that law enforcement

3   has general business operations?"

4           She said yes.

5           "QUESTION:  So according to NCIS's practices, if

6   an employee is doing law enforcement, that would support

7   the exempt classification?

8           "ANSWER:  Correct.

9           "QUESTION:  But in those OPM decisions we spoke

10  about, the criminal investigators were found nonexempt.

11          "ANSWER:  Yes, they were."

12          So, again, Ms. Cruz -- with all respect to

13  Ms. Cruz, her grasp of some of the basics of FLSA

14  classification didn't seem to be exhibited during her

15  testimony.

16          And then the last point I wanted to mention about

17  Ms. Cruz's testimony is that she -- in her own kind of

18  review of the position, which she did after we filed the

19  lawsuit, she only looked at the position description.

20  This relates to some of the Court's questions about the

21  position description.  But she -- when we asked her (as

22  read):

23          "QUESTION:  Did you actually do anything else to

24  verify whether the position actually did any of those

25  things?"

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1          She said no.

2          Then:

3          "QUESTION:  Did you ask anyone how much time the

4     employee spent on those various things?"

5          She said no.

6          So it really was only, in isolation, the position

7     description.  And in some of her other testimony that

8     she gave, she acknowledged -- I asked her (as read):

9          "QUESTION:  In order to do classification, you

10    have to know how much time the employee spends on their

11    duties.

12         "ANSWER:  Yes, we do require that.

13         "QUESTION:  That's a necessity given the

14    regulations that are in place."

15         And she agreed.

16         So she understood that it is not possible, under

17    the FLSA, to classify a position based solely on a

18    position description that has no information at all

19    about how much time the employee spends on different

20    duties, because then you just don't know which duties

21    are the most important duties to that -- to that

22    position.

23         The next piece of evidence I wanted to talk

24    about, which we have already talked about, is the

25    complaints that were raised about overtime pay for this

554

Trial - Closing Argument

John A. Shea v. USA                                           3/20/2019

1     team.   So in our view those should have, at the very

2     least, given NCIS some reason to look into its

3     compliance, although it already had had that obligation

4     under the FLSA.

5            And then the last piece of evidence that I wanted

6     to mention is the reclassification of the position.   So

7     I think we and the Government have different views on

8     whether the Court can consider that, how the Court can

9     consider it, but in our view, at a very minimum, even if

10    it doesn't go to the liability issue, it does go to the

11    damages question, which relates to NCIS's state of mind

12    and the reasonableness of its actions, and we think the

13    Court can look at that reclassification and say that

14    NCIS was capable of determining that at least some

15    members of this position should be nonexempt.   The last

16    business day before trial, they changed everyone to

17    nonexempt, including Mr. Shea, and I think that does say

18    something about their state of mind and their

19    reasonableness in applying the FLSA.

20           So that concludes my discussion of the liquidated

21    damages issue.   The last two issues relate to the

22    methodology for calculating damage and also the

23    willfulness issue, and I think I'll largely rest on our

24    briefs for those, but I can -- I'll give a quick summary

25    and answer any questions that the Court has.

Trial - Closing Argument

John A. Shea v. USA                                        3/20/2019

1        So on the damages methodology, what we're
2   suggesting to the Court is that it look at -- look at
3   Mr. Shea's hours and his rate of pay and calculate what
4   he would have earned on time and a half for his overtime
5   hours and then subtract from that what he actually
6   earned under the AUO system.  So it's a pretty
7   straightforward calculation.
8        There is a different method that the Government
9   relies on, which is the method you use for an employee
10  who's both on AUO and getting FLSA overtime, and that's
11  a somewhat complicated formula that I can talk through,
12  but that's the method they rely on.
13       We believe that doesn't apply here because the
14  testimony shows that NCIS doesn't actually pay --
15  doesn't actually follow that formula, because if someone
16  is put on AUO -- I'm sorry, if someone is put on FLSA,
17  they take them off AUO.  So, in other words, if Mr. Shea
18  had been correctly classified in our view, he would have
19  been taken off AUO, and then he just would have been
20  getting that time and a half amount for his overtime
21  hours.  So that's why we think the Court should not
22  apply the other method.
23       And then the willfulness issue is largely
24  captured by what I've already said about the good faith
25  and liquidated damages in terms of NCIS's past

Trial - Closing Argument

1    violations, its -- the testimony from its head of
2    classification, its failure to check its compliance, and
3    its reclassification of the position.
4         So unless the Court has any other questions, we
5    believe that, based on the record and the arguments that
6    we've submitted, that the Court should find Mr. Shea not
7    exempt and award him damages and liquidated damages and
8    also rule for us on the other issues that we've raised.
9         THE COURT:  All right.  Thank you, Mr. Rosenthal.
10        Mr. Kerr?
11        MR. KERR:  Thank you, Your Honor.
12        Good morning, Your Honor.
13        THE COURT:  Good morning.
14        MR. KERR:  May it please the Court.
15        As a senior level investigations specialist,
16   Mr. Shea helps lead the special surveillance team at
17   NCIS.  Mr. Shea shows other team members how to use
18   technical gear.  He checks to make sure that the other
19   members of the team are maintaining their gear and, if
20   necessary, that they are getting it repaired or
21   replaced.
22        Mr. Shea's supervisor, Mr. Freeman, testified
23   that Mr. Shea answers questions from junior team members
24   about surveillance tactics, about operations, about
25   technical equipment, and about general administrative

Trial - Closing Argument

John A. Shea v. USA                                      3/20/2019

1    functions from the special surveillance team or NCIS.

2         As a senior level investigations specialist,

3    Mr. Shea also serves as team lead on a rotational basis.

4    According to the position description for investigations

5    specialists, the team leads are responsible for

6    directing all aspects of the surveillance operation.

7    The evidence introduced at trial supports this

8    description.

9         Mr. Shea asserts that he does not direct

10   surveillance, but Mr. Shea testified that when serving

11   as team lead, he doesn't have the luxury to sit back

12   somewhere to direct the team.  He's also performing

13   surveillance.  The fact that he's also performing

14   surveillance, however, does not change the fact that

15   he's directing the team during the surveillance

16   operation.

17        Mr. Shea testified that, as team lead, if he

18   thinks a team member is in the wrong position, he will

19   ask them to move.  The team lead is responsible for

20   making sure all team members are in the right position

21   for the entire mission.  Even if Mr. Shea's experience

22   shows him that they usually are there themselves, he's

23   responsible for making sure they get there.

24        Mr. Shea also testified that as team lead, you're

25   not going to let someone on your team follow someone

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

1    that hasn't been designated as a target.  The team lead

2    is responsible for making sure the team is following the

3    rules and procedures during the entire mission, even if

4    in Mr. Shea's experience they are following the rules

5    and procedures.

6         Mr. Shea testified that during surveillance

7    missions, there are always going to be disagreements and

8    personality conflicts.  The team lead is responsible for

9    resolving these disagreements and conflicts and keeping

10   everyone focused on the mission at all times.

11        Mr. Freeman testified that Mr. Shea is a good

12   team lead because he never raises his voice.  He remains

13   calm even in situations where Mr. Freeman would have

14   lost his mind.  Mr. Shea has a very democratic method,

15   Mr. Freeman said, but he still kept control, and someone

16   on the team has to keep control; someone has to be in

17   charge.

18        When the team conducts a surveillance operation,

19   there are a lot of moving pieces.  There are different

20   personalities, and, of course, there are the mission

21   objectives.  The team goes on surveillance operations

22   all over the United States.  Some of them last for weeks

23   or even months.

24        In 2015, the team was out in the field

25   approximately 70 percent of the team; 50 to 60 percent

Trial - Closing Argument
John A. Shea v. USA                                                    3/20/2019

1    of the time in 2016; and in 2017, 40 to 50 percent of
2    the time.  The supervisor does not usually travel with
3    the team.  On surveillance missions, therefore, the team
4    lead is the officer in charge.  Mr. Shea's work leading
5    the team is, thus, nonmanual work directly related to
6    management or general operations of NCIS.
7            Mr. Shea also exercises discretion and
8    independent judgment on matters of significance.  With
9    minimal supervision, Mr. Shea determines how to execute
10   surveillance operations.  He decides whether team
11   members have put themselves in the best positions.  If a
12   surveillance method is not working, Mr. Shea decides on
13   the course of action after comparing and evaluating
14   various options.  He has to determine whether the points
15   of observation are remaining discreet and that they
16   haven't been compromised or burned.  Such decisions
17   might be second nature to Mr. Shea, but he is
18   nonetheless making a judgment call; he's exercising
19   discretion.
20           THE COURT:  One thing we didn't have testimony
21   about is what happens when something unusual happens
22   during a surveillance.  We had testimony, if the Court
23   recalls correctly, that the team lead would check in
24   with the case agent at least once a day, but some things
25   have to happen that are a little unusual, and one would

Trial - Closing Argument
John A. Shea v. USA                                          3/20/2019

1    think that that would occur more than once a day.  Then
2    the question is, what would happen?  We didn't have any
3    testimony about that.
4              MR. KERR:  Well, there was testimony about the
5    unusual event where the subject is leaving town or where
6    possibly a new target, potential target, has --
7              THE COURT:  That raised the latter question that
8    the Court had, because you could have a situation where
9    there was an emerging other individual who might be
10   quite relevant to whatever the team was doing, and the
11   Court really wasn't cognizant or wasn't told what
12   happens in that circumstance, what the team lead's
13   responsibilities were with the case agent.
14             MR. KERR:  Well, in those extreme circumstances,
15   I think the testimony was that the team lead would call
16   the case agent.
17             THE COURT:  Right.
18             MR. KERR:  But in other circumstances where the
19   target is just moving around, the team moves with the
20   target, and it's up to the team lead to direct the team,
21   to --
22             THE COURT:  Well, there are obviously rules of
23   surveillance, and this situation with another target
24   emerging might be outside the rules of surveillance or
25   it might be covered by it.  The Court doesn't need to

Trial - Closing Argument

John A. Shea v. USA                                        3/20/2019

1   know what those rules are, but it's just -- that has to

2   do with the team lead's function with respect to the

3   case agent.

4        MR. KERR:  I understand, Your Honor.

5        Even as a team member, Mr. Shea's deciding how

6   closely to follow someone, whether to follow someone

7   into a store, and he's managing his heat state.

8   Mr. Shea asserts that the evidence shows only that all

9   team members are free from supervision.  We agree with

10  the latter point of this.  The type of surveillance

11  performed by the team is not simply watching a drug buy,

12  where the only discussion might be when to move in for

13  the arrest.  It is complicated and requires experience,

14  analysis, and discretion from all team members.

15       As team members move up the ladder and take on

16  more responsibilities of leading the team, this requires

17  even more experience, analysis, and discretion.

18  Mr. Shea asserts he spends no more than 3 percent of his

19  team leading the team.  The evidence does not support

20  this figure.

21       Because of his senior level, NCIS relies on him

22  to impart his expertise and his knowledge to junior team

23  members on an ongoing basis.  Indeed, Mr. Shea is of

24  such a senior level that other members serving as team

25  lead ask him for help.  There's a running joke that

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

1    Mr. Shea actually is the one serving as team lead when
2    other team members have been assigned the role.
3          Mr. Freeman testified that in 2015 and 2016,
4    Mr. Shea spent about 50 percent of his time as team
5    lead.  In our brief, we tried to use an alternative
6    method to show that Mr. Shea spends 50 percent of his
7    time, but regrettably, as Mr. Shea points out, it looks
8    like we subtracted some of his leave hours out twice.
9    That method, however, still reveals that he spent up to
10   38 percent of his time.
11         Mr. Freeman's testimony of 50 percent of his time
12   is based on Mr. Freeman's own experience serving as his
13   supervisor.  The evidence shows that he kept track of
14   the duties on a white board, which, of course, is wiped
15   off at the end of a mission.
16         The team lead is responsible for the mission for
17   the whole duration of the mission, from the time he or
18   she is assigned to when the final report is submitted.
19   In the office before the mission, the team lead is
20   responsible for getting the team ready and making sure
21   that the equipment is ready.  Mr. Shea asserts that not
22   all the time in the office is spent preparing, but he
23   doesn't dispute that the team lead is responsible during
24   that time for making sure the team and the equipment are
25   ready for the surveillance operation.

Trial - Closing Argument

John A. Shea v. USA                                      3/20/2019

1          Just like the six months in advance of trial in
2     this case, Mr. Shea's counsel was responsible for making
3     sure her team was ready, making sure none of them had
4     issues at home that would distract them from the trial
5     or maybe changing the trial to adjust to any changes in
6     the case.
7          Mr. Shea's duty as team lead qualified at least
8     as an alternative primary duty under the OPM test.
9     First, spending up to 40 percent of his team as team
10    lead constitutes a substantial part of his work.
11    Second, the position description states that senior
12    investigations specialists will serve as team lead on a
13    rotational basis.  This is evidence that the position
14    exists to train people as they move up the ladder so
15    that eventually they will have people who can serve as
16    team lead.
17         Mr. Shea points out that not all investigations
18    specialists serve as team lead, which is true, but that
19    just shows some decide not to climb the ladder to the
20    very top.  Some team members are content just performing
21    surveillance.  The evidence shows, however, that without
22    a team lead, the team could not function in the field.
23         Mr. Freeman, for example, testified that the team
24    lead makes sure that all the moving parts are landing
25    where they need to land, are moving in the way they need

Trial - Closing Argument

1   to move, that people get to where they need to be to do

2   the job they need to do.  NCIS needs senior

3   investigations specialists like Mr. Shea to lead the

4   team.

5           Third, directing all aspects of a surveillance

6   operation is clearly exempt work.  The OPM test for the

7   alternative primary duty is satisfied.  The evidence

8   thus shows that Mr. Shea qualifies for the

9   administrative exemption.  His primary duty is to assist

10  the team in the field.  Therefore, the Department of

11  Labor regulation, the first responder regulation about

12  firemen, police officers, and other employees, does not

13  apply.  That regulation on its face applies when the

14  primary duty is to investigate crime, to fight fires, or

15  to conduct surveillance.

16          We ask the Court, therefore, to enter judgment in

17  favor of the United States.  However, even if the Court

18  decides that Mr. Shea does not qualify, based on

19  Mr. Shea's autonomy and responsibilities as team lead,

20  NCIS's decision to classify him as exempt was

21  reasonable.  NCIS relied on the position description to

22  maintain the FLSA exemption and then relied on an annual

23  confirmation from his supervisor that Mr. Shea was doing

24  the work that it describes.  This is consistent with the

25  Office of Personnel Management regulation.

Trial - Closing Argument

John A. Shea v. USA                                         3/20/2019

1         The classification of the GS team member as
2    exempt was an administrative mistake.  It was corrected
3    when he moved up to GS-9.  At trial, Ms. Cruz reviewed
4    the position description and indicated that the exempt
5    classification was still correct today for Mr. Shea.
6    The description does not have time broken off, as
7    Mr. Shea's counsel pointed out, but it does have a
8    common theme of managing the collection and assessment
9    of information, of planning and scheduling and
10   coordinating logistics and operational aspects --
11        THE COURT:  What does the Court do with the fact
12   that the position description and the classification
13   occurred under a different legal regime, in essence, in
14   2007?  As the Court understands it, they didn't
15   necessarily apply the same criteria that they would if
16   they were doing it afresh today with these, for example,
17   recitations of particular percentages of time and that
18   sort of thing.  It had more to do with functions.
19        MR. KERR:  Well, Your Honor, as Mr. -- sorry, as
20   Ms. Cruz testified, the position description has a --
21   has a common theme.  So the fact that it's not broken
22   down in different hours of time, it's the overall
23   character of the position and the overall character of
24   the duties which is consistent with the regulations,
25   which say the Court looked at the overall job as opposed

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1     to the specific duties.

2           THE COURT:  Well, the Court seemed to recall that

3     the position description and the classification were

4     developed under a specific regime that DOD had, and then

5     they -- and that kind of carried over into the current

6     situation.  Does the Court remember that correctly?

7           MR. KERR:  That's correct, Your Honor, but there

8     was no -- there was no effort to go back or no duty to

9     go back and to correct all the position descriptions.

10    It was a matter of, going forward, they would use the

11    new position descriptions.

12          THE COURT:  Right.

13          MR. KERR:  And with regard to the position

14    description, there has been no changes to Mr. Shea's

15    position description.  A draft was produced under

16    instruction from counsel in anticipation of possibly

17    settling this case.  NCIS never necessarily intended

18    that it would become public, and, in fact, they hoped

19    that it wouldn't become public, depending on the outcome

20    of the settlement negotiations and the outcome of the

21    Court's decision.

22          THE COURT:  Well, other people on the

23    surveillance team have been reclassified, and have their

24    position descriptions changed and are those changed --

25    if so, are those changed position descriptions

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    available?

2            MR. KERR:  No.  No position descriptions have

3    been changed.

4            THE COURT:  All right, thank you.

5            MR. KERR:  There have been drafts, but there has

6    been no official -- there has been no release of the

7    information thus far.

8            THE COURT:  All right, thank you.

9            MR. KERR:  Also, if the Court awards Mr. Shea

10   back pay, the Office of Personnel Management has

11   developed a method for calculating FLSA payments for

12   nonexempt employees who also receive administratively

13   uncontrolled overtime.  While at NCIS usually nonexempt

14   employees do not qualify for administratively

15   uncontrolled overtime, the fact is that Mr. Shea, if he

16   receives back pay, will be in this position of having

17   received AUO and now receiving FLSA overtime, and the

18   method developed by the Office of Personnel Management

19   for such employees should be applied.

20           I have nothing further, Your Honor.  Thank you.

21           THE COURT:  All right.  Thank you, Mr. Kerr.

22           Mr. Rosenthal, do you have something?

23           MR. KERR:  Your Honor, if I may --

24           THE COURT:  Yes?

25           MR. KERR:  -- the Government would like to

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

1    request copies of the slides so that we have them.

2              THE COURT:  All right.

3              Mr. Rosenthal, can you provide copies?

4              MR. ROSENTHAL:  Yes, I can.

5              THE COURT:  Thank you.

6              MR. ROSENTHAL:  Can I wait until -- do you want

7    them right now?

8              MR. KERR:  At some point.

9              MR. ROSENTHAL:  Okay.

10             Okay.

11             THE COURT:  Yes, please.

12             MR. ROSENTHAL:  And we have enough copies for the

13   Court as well, so -- if the Court wants them.

14             I have a few additional comments.  One is, in

15   terms of the question that the Court asked to opposing

16   counsel about unusual circumstances on a mission, there

17   was -- I agree that there wasn't a lot of information

18   about that in the record.  We did just now identify one

19   relevant portion, which is on page 194, beginning at

20   line 15.  This was during Mr. Shea's examination.  He

21   was asked (as read):

22             "QUESTION:  What happens if something unusual

23   happens during a mission?  How do you handle it?

24             He said:

25             "ANSWER:  We've had missions where -- where it

Trial - Closing Argument

```
 1    is -- something has evolved and you need direction from
 2    the case agent.  So you have their phone number, their
 3    cell phone number, or means to contact them.  So if I
 4    call the case agent and I don't get a response, then my
 5    next call is to my supervisor."
 6          So basically the record suggests that if there is
 7    something outside the procedures, that Mr. Shea would
 8    either -- would attempt to contact the case agent or the
 9    supervisor, one or the other.
10          THE COURT:  Well, or outside expectations or
11    sufficiently outside expectations that it was unusual,
12    those things have to happen.
13          MR. ROSENTHAL:  Right.  Yes, I agree with that,
14    Your Honor.  And I also agree with -- I think the
15    exchange which elucidated that a great number of things
16    that could happen are covered by the basic procedures in
17    terms of -- and Mr. Shea kind of illustrated this with a
18    chart.  If the target moves -- it looks kind of like a
19    football play or something, but if a target moves here,
20    we're going to move here.
21          THE COURT:  So zone defense.
22          MR. ROSENTHAL:  Exactly.  So there are pretty
23    established procedures, and the testimony shows they go
24    through training and they get these procedures ingrained
25    into them, and they basically implement those on a -- on
```

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1    somewhat a rote basis.

2            Mr. Kerr said this involves analysis and

3    discretion, but there's -- I don't believe that there's

4    any testimony in the record that there's a process of

5    analysis.  I think the team reacts to what they see

6    based on their training and based on their procedures

7    that they have learned.

8            And we cited a regulation which the Government

9    hasn't commented on which says that an employee who

10   exercises skill but does so in the course of

11   implementing kind of well-defined procedures does not

12   have the adequate discretion that the test requires.

13           And, of course, discretion is only one element of

14   the test.  So even if the Court were to disagree with

15   that and find that Mr. Shea, as team member or team

16   lead, is doing a lot of analysis, making a lot of

17   decisions, that's not enough to find him exempt because

18   you also have the management or general business

19   operations prong, which in our view is really the most

20   important one.

21           A lot of what Mr. Kerr said is I think belied by

22   a closer examination of the record in terms of how often

23   Mr. Shea serves as team lead and what he does as team

24   lead, and so we think that that -- it's easy to -- in an

25   abstract way to kind of inflate what this role means,

Trial - Closing Argument

1    but when you look at what actually happens in the field
2    from Mr. Shea's testimony, it's, you know, following the
3    procedures.  He said on rare occasions there's maybe a
4    gap where someone should be but isn't, and he will tell
5    the person to go there, but it's pretty straightforward
6    stuff, and all of that only relates to the time when he
7    is team lead, which is by far a minority of his time.
8            Moreover, the Government's not saying anything to
9    distinguish, based on the facts, those cases that we
10   talked about earlier, Mullins, Morrison, et cetera.
11   They're really right on point to this case.
12           The other -- the other question the Court asked
13   about the fact that the position was classified under a
14   prior system, I -- I just want to observe there.  First
15   of all, I don't -- it's not so much the legal -- that
16   OPM's requirements changed, I don't think.  It's that
17   the kind of HR system changed in order to better comply
18   with OPM's requirements.
19           But we would argue that at that point maybe the
20   Government -- maybe the Government didn't have an
21   immediate obligation to convert all the positions, but
22   this was a -- I believe the testimony was that the
23   change occurred in 2010.  So for a period of now seven,
24   eight, nine years, NCIS never revisited this, even
25   though they knew that that position description lacked

Trial - Closing Argument

John A. Shea v. USA                                               3/20/2019

1     the information that you need for an FLSA
2     classification.
3           THE COURT:  Was the prior method and position --
4     in dealing with position descriptions and
5     classifications peculiar to the Department of Defense?
6           MR. ROSENTHAL:  I don't know the answer to that,
7     Your Honor.
8           THE COURT:  Okay.
9           MR. ROSENTHAL:  So we think that if you -- in a
10    sense, it's sort of an odd situation in which the
11    liquidated damages question is actually an easier
12    question than the main liability question, I would say,
13    because we really just have no evidence at all that NCIS
14    took any active steps to check whether this -- they were
15    complying, and then on top of that the other violations
16    that we've heard about.
17          So we would ask the Court once again to find for
18    Mr. Shea on all of the disputed issues, and we thank the
19    Court.
20          THE COURT:  All right.  Thank you, Mr. Rosenthal.
21          Mr. Kerr?
22          MR. KERR:  Your Honor, two quick points.
23          THE COURT:  Yes, please.
24          MR. KERR:  If you go to the Mullins and Morrison
25    cases, as we say in our brief, these are distinguishable

Trial - Closing Argument

John A. Shea v. USA                                          3/20/2019

```
 1   because the primary duties in those cases were law
 2   enforcement or firefighting or, in this case, you know,
 3   the equivalent would be performing surveillance.  Our
 4   position is that that's not Mr. Shea's primary duty.  So
 5   those cases and the DOL regulation are both
 6   distinguishable and not applicable.
 7            And also I would just like to put on the record
 8   an objection that the slides, you know, have a lot of
 9   math and a lot of percentages, but they don't show where
10   they come from.
11            THE COURT:  Right.
12            MR. KERR:  So I would just like to put that
13   objection on the record.
14            THE COURT:  They are not evidence.
15            MR. KERR:  I understand, Your Honor.
16            THE COURT:  They are not even a demonstrative.
17            MR. KERR:  I wasn't sure if they counted as a
18   demonstrative.
19            THE COURT:  Okay, all right.
20            MR. KERR:  I put that objection on the record.
21   Thank you, Your Honor.
22            THE COURT:  Okay, thank you.
23            And, Mr. Rosenthal, if you would make sure that
24   the Clerk has -- oh, would you, please?
25            MR. ROSENTHAL:  Yes.  And I would just note, all
```

Trial - Closing Argument

John A. Shea v. USA                                      3/20/2019

 1    the figures come from the appendices to our briefs,

 2    Appendix A and B.

 3            THE COURT:  I was going to say, the numbers are

 4    in the briefs, actually.  So we can cope with that.

 5            Well, this is a fascinating case.  I actually

 6    watched NCIS once, so -- otherwise, I wouldn't -- but it

 7    was a little different than this case, so in any event,

 8    I don't think I was influenced one way or the other, but

 9    I will admit or concede that I did watch one episode of

10    NCIS.  It's a fairly popular program, I take it.

11            It's a fascinating case.  It's a fairly close

12    case.  I am not going to promise you a decision

13    tomorrow, but we will take our time and think about it

14    and do the best we can.

15            Thank you very much.  The case is submitted.

16            ALL COUNSEL:  Thank you, Your Honor.

17            (Whereupon, at 11:05 a.m., the proceedings were

18    concluded.)

19

20

21

22

23

24

25

575

Trial - Closing Argument

John A. Shea v. USA                                    3/20/2019

1                    CERTIFICATE OF TRANSCRIBER

2

3

4          I, Susanne Bergling, court-approved transcriber,

5     certify that the foregoing is a correct transcription

6     from the official digital sound recording of the

7     proceedings in the above-titled matter.

8

9

10

11    DATED:  03/27/2019          s/Susanne Bergling

12                                SUSANNE BERGLING, RMR-CRR-CLR

13

14

15

16

17

18

19

20

21

22

23

24

25